**Reverse and Render in part;  Affirm in part and Remand and Opinion Filed September 2, 2016**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-14-01294-CV

**TOM KARTSOTIS, Appellant**

**V.**

**RICHARD L. BLOCH, INDIVIDUALLY AND AS A TRUSTEE OF THE RICHARD AND NANCY BLOCH FAMILY TRUST, AND NANCY BLOCH AS A TRUSTEE OF THE RICHARD AND NANCY BLOCH FAMILY TRUST, Appellees**

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-11-04489**

## OPINION

Before Justices Myers, Stoddart, and Whitehill
Opinion by Justice Whitehill

Appellees' motion for rehearing is denied and appellant's motion to correct clerical error is denied as moot.  We withdraw our opinion dated July 7, 2016, and vacate the judgment of that date.  This is now the Court's opinion.

This case arises from a series of related contracts in which appellant Tom Kartsotis, appellee Richard Bloch, individually and as trustee of the Richard and Nancy Bloch Family Trust and Nancy Bloch (Bloch), and Will Cureton agreed to allocate among themselves secondary responsibility for numerous real estate development loans and liabilities should the primary debtors not pay their debts.  The underlying facts are essentially undisputed.

A core dispute is whether the defined term "Existing Obligations" in the parties' Contribution and Indemnity Agreement (CIA) means the primary debtors' financial obligations listed as "Existing Obligations" on Exhibit A to the CIA, as Kartsotis contends, or whether "Existing Obligations" means the CIA parties' secondary liabilities, such as guaranties and indemnities, related to the Exhibit A obligations, as Bloch asserts. If Kartsotis is correct, he does not owe Bloch any money under the CIA. Conversely, if Bloch is correct, Kartsotis must reimburse him for a portion of the sums Bloch paid to settle claims against him based on his guaranties and indemnities.

Another dispute concerns a Guaranty Bank Agreement (GBA), and whether Kartsotis's refusal to seek a third loan extension before paying Bloch's share of the debt and seeking reimbursement from Bloch constitutes a failure to mitigate damages.

After considering the parties' cross-summary judgment motions, the trial court signed a judgment that awarded judgment for Kartsotis against Bloch on Kartsotis's GBA claims and for Bloch against Kartsotis on Bloch's contribution and reimbursement CIA claims. The trial court, among other relief, also awarded both parties attorneys' fees, netted the total sums due each party, and gave Bloch a net judgment against Kartsotis for $200,982.93 plus contingent appellate attorneys' fees and interest.

Kartsotis's appeal asserts seven issues, and Bloch's cross-appeal presents three cross-issues. For the reasons explained below, we conclude that, among other things, as a matter of law:

(i) the term "Existing Obligations" in the CIA means the primary debtor's liabilities listed on Exhibit A to the CIA, and the trial court thus erroneously awarded Bloch relief on his CIA claims;

(ii) the trial court correctly awarded Kartsotis relief regarding his GBA claims against Bloch.

Accordingly, we reverse the judgment as to Bloch's damages and requested declaratory relief and render judgment that he take nothing on those claims. We also affirm the amount of attorney's fees and interest on those fees awarded to Bloch, but in the interest of justice, remand the issue of whether it is equitable and just for Bloch to recover those fees under chapter 37. Finally, we affirm the judgment for Kartsotis.

## I. The Sealed Record

Writing this opinion presents an unusual problem because large parts of the record are under a sealing order that we must respect. Specifically, the vast majority of the record and all of the briefs were filed here under seal following a Rule 76a sealing order in the trial court. And, the parties' appellate issues require construction of key documents that are arguably included in the sealed materials. But, the sealed briefs do not indicate what facts and evidence should be considered confidential and under seal.

However, we must hand down a public opinion explaining our decisions based on the record. *See* TEX. R. APP. P 47.1, 47.3 (all opinions are open to the public and must be made available to public reporting services); TEX. GOV'T CODE ANN. § 552.022 (a)(12) ("final opinions, including concurring and dissenting opinions, and orders issued in the adjudication of cases" are "public information"). This we cannot do without mentioning the key documents and certain specific facts. *See Masterguard, L.P. v. Eco Technologies Int'l LLC*, 441 S.W.3d 367, 371 (Tex. App.—Dallas 2013, no pet.).

Accordingly, we told the parties that the trial court's sealing order appeared to be overly broad and asked them to specify the materials not sealed for purposes of this appeal. Although the parties responded by designating the items that should remain sealed, those items include

–3–

entire volumes of the reporter's record, motions for summary judgment and responses, objections to summary judgment evidence, and affidavits (including an affidavit authenticating many of the key documents in the case).

We have nonetheless strived to preserve the confidentiality of the materials we believe the parties intended to be confidential. Thus, we avoid referring to those materials where possible and make some references deliberately vague. *See Trilogy Software, Inc. v. Callidus Software, Inc*., 143 S.W.3d 452, 456 n.1 (Tex. App.—Austin 2004, pet. denied) (deliberately vague references to protect confidentiality); *R.V.K. v. L.L.K*., 103 S.W.3d 612, 614–15 (Tex. App.—San Antonio 2003, no pet.) (attempting to "strike a fair balance" between parties' confidentiality interest and fulfilling responsibilities as a court of record).

## II. Background

### A. Key Persons and Entities

The key persons, and entities involved in this case include:

- Kartsotis, who made real estate investments through Bedrock Dirt, LP.;

- Bloch, who made real estate investments through CLB Partners, LTD;

- Cureton, who made real estate investments through CLB Partners, LTD;

- CLB Partners, LTD (CLB Partners), which is a limited partnership that Bloch and Cureton created to make real estate investments before Kartsotis began investing with them;

- CLB Capital Partners LP (CLB Capital), which is a limited partnership that Bloch, Cureton, and Kartsotis formed to make investments in real estate projects after Kartsotis began investing with Bloch and Cureton; and

- Black Bull Run Development, LLC (BBR), which was a special purpose entity established to create a golf-course community in Montana.

The following chart illustrates these relationships at the relevant point in time:



*Kartsotis v. Bloch* Organization Chart

## B. The Parties Pursue a Real Estate Development Business

Bloch and Cureton previously conducted a real estate development business through CLB Partners. Kartsotis joined the business in November 2007, signing three agreements: (i) the CIA; (ii) the Put and Call Agreement (Put Agreement); and (iii) the Limited Partnership Agreement (CLB Capital Partnership Agreement).

## C. The Partnership Agreement

The CLB Partnership Agreement created CLB Capital as the new parent entity for the parties' projects. CLB Capital would purchase, maintain, manage and sell real property, and borrow money for these activities.

CLB Partners and Bedrock each held an interest in CLB Capital. The remaining interest was held by CLB Capital GP.

**D.  The BBR Project**

Before CLB Capital was created, BBR had borrowed money to develop its project. These funds included a construction loan and a letter of credit from La Jolla Bank (the BBR Loans).[1] The LaJolla Bank loan was later transferred to OneWest Bank and is a focal point in this case. The loan amount and letter of credit appear to be under seal.

Bloch had previously guaranteed the BBR Loans. And, because the loans were secured by real property, BBR had to obtain title insurance. The title insurer, Commonwealth Title, had required Bloch to indemnify it for any loss due to mechanics' liens on the property.

BBR had also signed a golf equipment lease with Wells Fargo Financial Leasing, Inc. (Wells Fargo Lease). Bloch had personally guaranteed the Wells Fargo Lease.

**E.  The CIA**

The CIA, executed in 2007, determined how Bloch, Kartsotis, and Cureton, defined in that agreement as "Guarantors," would share responsibility for CLB Capital's liabilities. The CIA acknowledged that each Guarantor, directly or indirectly, owned a one-third interest in Capital Partners and defined those interests as their "Pro Rata Percentage."

The CIA's recitals distinguished between "Existing Obligations" and "Future Obligations" and then collectively defined both as "Obligations":

> B.  CLB Capital and its subsidiaries have incurred indebtedness ("Loans") with respect to various lenders in conjunction with the business of CLB Capital and its subsidiaries and Bloch and Cureton have executed certain guaranties, indemnities or other agreements, relating to the Loans, which are set out on Exhibit "A" hereto (the "Existing Obligations").

---

[1] BBR borrowed one amount in 2006, and then an additional amount in 2007.

C. The Guarantors contemplate that, from and after the date of this Agreement, they will each execute certain guaranties, indemnities or other agreements related to loans to CLB Capital and its subsidiaries ("Future Obligations", the Existing Obligations and Future Obligations being collectively referred to as the "Obligations"). The Guarantors desire to enter into this Agreement to effect an equitable sharing of their risk and liability in respect of the Obligations.

(Emphasis original).

The Exhibit A "Existing Obligations" list included the BBR Loans and the Wells Fargo Lease. Exhibit A, however, did not mention Commonwealth Title.

The CIA's substantive terms stated the Guarantors' responsibility for Obligations thusly:

Section 1. Contribution and Reimbursement. If any Guarantor makes a payment in respect of the Obligations, such Guarantor shall have the rights of contribution and reimbursement set forth below, and shall be indemnified as set forth below.

The CIA then provided the following duty to pay trigger point and related terms:

Section 2. Reimbursement; Joint and Several Liability. If any Guarantor (the "Paid Guarantor") makes *a payment upon or in respect of the Obligations that is greater than its Pro Rata Percentage [1/3] of the Obligations,* the Paid Guarantor shall have the right to receive, from the other Guarantors who have not paid their Pro Rata Percentage (each an "Unpaid Guarantor"), and each Unpaid Guarantor agrees to pay to the Paid Guarantor, an amount such that the net payments made by the Paid Guarantor in respect of the Obligations shall be shared by Guarantors pro rata in proportion to their Pro Rata Percentage. Each Unpaid Guarantor shall pay amounts due to Paid Guarantor within ten (10) business days following delivery to the Unpaid Guarantor of a notice setting out the amount due from the Unpaid Guarantor. Any amounts not paid by an Unpaid Guarantor to the Paid Guarantor within such ten (10) business day period shall bear interest at fourteen percent (14%) per annum from the due date until paid. Each Unpaid Guarantor hereby indemnifies any Paid Guarantor, and agrees to hold such Paid Guarantor harmless from and against, any and all amounts which such Paid Guarantor shall ever be required to pay in respect of the Obligations in excess of such Paid Guarantor's Pro Rata Percentage of the Obligations.

(Underlines original, italics added).

Construing these recitals and terms is at the heart of this dispute.

F. **The Put Agreement**

The Put Agreement gave Kartsotis the right to withdraw from CLB Capital after two years and be indemnified for any subsequent, post-withdrawal liability. Specifically, it gave

–7–

Bedrock a put right through which Kartsotis could require CLB Partners to purchase Bedrock's interests in CLB Capital.

**G.** **The Guaranty Bank Loan**

In 2008, CLB Capital borrowed money from Guaranty Bank (Guaranty Bank Loan). Bloch, Cureton, and Kartsotis each guaranteed the full loan amount.

CLB Capital, however, could not pay that loan and negotiated a Guaranty Bank Loan modification and extension under which Kartsotis and Bloch paid a certain amount and Cureton's portion was extended. The loan was subsequently modified again. The loan amount, as well as the amounts paid under the extensions, appear to be under seal.

The GBA, executed in 2009, expressly incorporates the CIA but removes the Guaranty Bank Loan from the CIA Obligations:

> Section 1. Guaranty Loan. The Guaranty Loan shall no longer be one of the Obligations (as defined in the Contribution Agreement [CIA]) which is covered by the Contribution Agreement, and the agreement among the Guarantors as to the payment of the Guaranty Loan and rights of contribution, reimbursement and indemnification with respect thereto shall be as set out in this Agreement.

The GBA also defines Bloch and Kartsotis as Guaranty Bank Loan guarantors. That agreement further requires Bloch and Kartsotis, as guarantors, to each pay fifty per cent of the guaranty obligation if Cureton does not timely pay his share.

**H.** **Kartsotis exercises his put right under the Put Agreement**

Kartsotis on December 1, 2009, exercised his put right, thereby triggering CLB Partners' duty to purchase Bedrock's ownership in CLB Capital.

**I.** **BBR Bankruptcy**

The BBR project was unsuccessful. Consequently, BBR filed bankruptcy and was considered insolvent at the time of the lawsuit.

## J.    The BBR Obligations

After BBR's bankruptcy, OneWest Bank sued Bloch and Cureton on their guarantees. Bloch and Cureton settled these lawsuits (the OneWest Settlement).[2]

Commonwealth Title and Wells Fargo Leasing, Inc. also sued Bloch, and he settled these lawsuits as well (the Commonwealth and Wells Fargo Settlements). (These Settlements are collectively referred to as the "BBR Settlements" and appear to be under seal).

## K.    Kartsotis pays the Guaranty Bank Loan

After two extensions, the Guaranty Bank Loan matured and CLB defaulted. The bank's successor then demanded payment from the Guarantors.

Bloch urged Kartsotis to agree to extend the loan's payment date for a year, and offered to pay the loan's debt service for that year. Kartsotis did not agree, and paid his share of the Guarantors' debt. When Bloch did not pay his share, Kartsotis paid it for him in order to retire the Guaranty Bank Loan. These payment amounts also appear to be under seal.

## L.    The Lawsuit

After making Bloch's payment on the Guaranty Bank Loan, Kartsotis demanded that Bloch reimburse him for Bloch's share of that debt which Kartsotis had paid. When Bloch did not do so, Kartsotis sued him for breaching the GBA. Bloch counterclaimed for breaching the CIA and requested declaratory relief concerning the parties' rights and obligations under the CIA, plus attorney's fees.

## M.    Summary Judgment

Kartsotis moved for summary judgment regarding: (i) his claims for breaching the GBA and attorney's fees, (ii) Bloch's related affirmative defenses, and (iii) Bloch's counterclaims for declaratory judgment, breach of contract, and other claims related to the CIA.

---

[2] OneWest Bank, FSB was La Jolla Bank's successor.

Bloch cross-moved for summary judgment on his claim for declaratory judgment, breaching the CIA, and attorney's fees.

The trial court granted Kartsotis's motion regarding breach of the GBA and awarded him damages but no attorney's fees or interest. The court also granted Kartsotis's summary judgment motion on Bloch's counterclaims and affirmative defenses, except the contract, declaratory judgment, and setoff claims.

The trial court granted Bloch summary judgment on his breach of contract and declaratory judgment claims and awarded him damages and attorney's fees, plus interest. The trial court's three judicial declarations explain the trial court's reasoning behind its reading of CIA section 2 and prospectively apply the trial court's reading to certain situations.

The trial court, however, denied Bloch's requested finding that he was entitled to indemnity under section 2 of the CIA.

**N.     Bench Trial and Final Judgment**

The remaining issues were tried to the bench, including payments Bloch claimed to have made regarding the Obligations after the summary judgment was entered, and Bloch's and Kartsotis's attorney's fees.

The trial court signed a judgment awarding Kartsotis $2,507,507.99, and Bloch $2, 708,480.92. Both parties were awarded interest and attorney's fees.

On September 10, 2014, the trial court signed an amended final judgment that offset the awards, leaving a single award for Bloch of $200,982.93, plus awarding Bloch conditional appellate fees and interest. The trial court also made findings of fact and conclusions of law, and subsequently amended those findings.

## III. Analysis

### A. Kartsotis's First, Second, Fifth, and Seventh Issues

#### 1. Kartsotis's First and Second Issues: Did the trial court err in determining that the CIA's reimbursement requirement was triggered, requiring Kartsotis to reimburse Bloch?

Kartsotis's first two issues argue that the trial court misconstrued the CIA's section 2 triggering threshold and its application to the facts:

1. Did the trial court err by granting summary judgment for the Blochs and denying summary judgment for Kartsotis on the Bloch's counterclaims for declaratory judgment and breach of the Contribution Agreement?

2. Did the trial court err in its construction of the Contribution Agreement?

Both issues turn on the meaning of the CIA's defined term "Existing Obligations."

As explained below, we conclude that, as a matter of law, "Existing Obligations" as defined in the CIA means the primary debtors' obligations listed on the Exhibit A. Accordingly, the CIA's payment requirements were not triggered for any BBR Settlement because Bloch's Settlement amounts were less than one-third of the corresponding outstanding obligation amount determined by the primary debtor's default. Therefore, the trial court erred as a matter of law in awarding damages to Bloch under the CIA. It follows that the trial court's declaratory judgments are also erroneous.

#### a. Standard of Review and Applicable Rules of Construction

We review the trial court's grant of a summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007); *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To prevail on a traditional summary judgment motion, the movant bears the burden of proving that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

When both parties move for summary judgment on the same issues and the trial court grants one motion and denies the other, we review both parties' summary judgment evidence and determine all questions presented. *Dorsett,* 164 S.W.3d at 661. Each party, however, bears the burden of establishing that it is entitled to judgment as a matter of law. *City of Santa Fe v. Boudreaux*, 256 S.W.3d 819, 822 (Tex. App.—Houston [14th Dist.] 2008, no pet.). If we determine that the trial court erred, we render the judgment that the trial court should have rendered. *Dorsett*, 164 S.W.3d at 661.

The construction of an unambiguous contract is a question of law, which we review de novo. *Matheson Tri–Gas, Inc. v. Atmel Cor*p., 347 S.W.3d 339, 343 (Tex. App.—Dallas 2011, no pet.).

Our primary concern is to determine the parties' true intent as expressed in their agreement. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005) (per curiam). To that end, we consider the entire writing and attempt to harmonize and give effect to all the contract's provisions by analyzing its terms with reference to the whole agreement. *Id*. at 312. Accordingly, no single provision alone will be controlling. Rather, all provisions must be considered with reference to the entire agreement. *Hackberry Creek Country Club, Inc. v. Hackberry Creek Homeowners Ass'n*, 205 S.W.3d 46, 56 (Tex. App.—Dallas 2000, pet. denied).

In determining the parties' intent, we may consider the construction the parties placed on the contract as evidenced by their conduct. *See Tettleton v. Employee Staffing Svs., Inc.*, No. 05-94-00707-CV, 1995 WL 437201, at *5 (Tex. App.—Dallas July 19, 1995, writ denied) (mem. op.).

Separate writings may be construed together if the connection appears on the face of the documents by express reference or by internal evidence of their unity. *Devonshire Place Neighborhood Ass'n v. Devonshire Place, Ltd.*, No. 01-98-00732-CV, 1999 WL 82617, at *4

(Tex. App.—Houston [1st Dist.] Feb. 4, 1999, pet. denied) (mem. op.). Documents incorporated into a contract by reference become part of that contract. *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) (orig. proceeding) (per curiam). When a document is incorporated into another by reference, both instruments must be read and construed together. *Pritchett v. Gold's Gym Franchising, LLC,* No. 05-13-00464-CV, 2014 WL 465450, at *5 (Tex. App.—Dallas Feb. 4, 2014, pet. denied) (mem.op.).

### b. Reimbursement from other Guarantors under the CIA

The focus of this dispute is the CIA's section 2 contribution, reimbursement, and indemnity terms, and in particular that section's "If Clause" triggering threshold. Kartsotis contends that the CIA's payment requirements were never triggered because Bloch did not pay more than his pro rata percentage of any BBR Obligation, which he construes to be the primary obligor's debt amounts (determined by the primary debtor's default). Stated differently, he argues that section 2 payments are not required unless a Guarantor pays more than his pro rata share of the borrower's (that is, BBR's) total outstanding debt, rather than the individual guarantor's secondary obligation (as resolved against that Guarantor).

Bloch, on the other hand, calculates the reimbursement trigger differently. He claims that the parties agreed to share one third of the Guarantor's contingent liability for individual debts and not one-third of the primary level debtor's debts. According to Bloch, Kartsotis misinterprets the CIA by treating "Loans"—as opposed to his payments to settle suits based on his individual guaranty or indemnity debts—as "Obligations." Based on that reading, Bloch asserts, for example, that he paid more than his share of his BBR settlement because, for example, he paid 100% of the amount he paid to settle OneWest's claims against him based on his guaranty. We disagree.

Turning to the CIA's terms, section 1 provides that a Guarantor has a right to contribution, reimbursement, and indemnity when a he makes a payment "in respect of the Obligations."

Section 2, which provides a triggering calculation and mechanics for such payments, has four parts:

(1) a calculation that triggers when a Guarantor must make a payment to another Guarantor for payments that the latter made "upon or in respect of the Obligations";

(2) a formula for calculating the reimbursement amount to be paid;

(3) mechanics for requesting payment and what happens if payments are not made; and

(4) the indemnity clause.

Under this structure, a Guarantor who makes a payment "upon or in respect of the Obligations" must first exceed the threshold test before being entitled to a reimbursement, contribution, or indemnity payment. If, but only if, the paying Guarantor's payments on an Obligation exceed the threshold, all of his payments on that Obligation are to be reimbursed on a pro rata basis.[3]

Thus whether Bloch's BBR Settlement payments triggered Kartsotis's duty to reimburse or indemnify him regarding those payments depends on the CIA's meaning of "Obligations," which in turn depends on the CIA's meaning of "Existing Obligations."

Reasonable arguments can be made for both Karsotis and Bloch if one considers only the text of the CIA's recitals and sections 1 and 2. But our analysis does not stop there. We also consider the CIA's Exhibit A, titled "Existing Obligations," and the interpretation the parties gave the CIA in the GBA before their present dispute arose.

---

[3] The indemnity clause may provide for a different cap on the indemnitor's liability, but, as discussed below, we do not need to resolve that potential conflict.

The CIA expressly refers to its Exhibit A, which must be read together with the rest of that contract. *See Gold's Gym,* 2014 WL 465450, at *5. It is undeniable that the Exhibit A is entitled "Existing Obligations"—the same term the CIA makes a defined term—and lists multiple primary level debtor obligations. The Exhibit A thus resolves the question of what the parties objectively intended when they agreed to that defined term. *See Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam) (objective rather than subjective intent controls); *see also Italian Cowboy Partnets, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011) (court's primary concern is to give effect to the written expression of parties' intent).

Furthermore, to the extent any question remains regarding the CIA's proper construction on this issue, the CIA parties' GBA, which expressly incorporates the CIA, confirmed their agreement that "Existing Obligations,"and thus "Obligations," under the CIA mean primary level debtor obligations. Specifically, GBA section 1 provides:

> Guaranty Loan. The Guaranty Loan shall no longer be one of the Obligations (as defined in the Contribution Agreement) which is covered by the Contribution Agreement, and the agreement among the Guarantors as to the payment of the Guaranty Loan and rights of contribution, reimbursement, and indemnification with respect thereto shall be set out in this Agreement.

This is a direct statement that CIA "Obligations," and thus CIA "Existing Obligations," are measured at the primary debtor level rather than by a CIA party's secondary guaranty or indemnity obligations. Otherwise, the Guaranty Loan would not have been considered to be an "Obligation" in the first place and there would have been no reason to exclude it from the CIA's "Obligations."

The GBA is in this respect consistent with our preceding reading of "Existing Obligations" in the CIA as meaning the principal debtors' obligations and thus further supports that conclusion. *See Henshaw v. Texas Nat'l Res. Foundation,* 216 S.W.2d 566, 570 (Tex. 1949)

–15–

(practical construction parties' place on a contract is highest evidence of parties' intent)*; Danaho Refining Co. v. Dietz,* 398 S.W.2d 307, 311 (Tex. Civ. App.—Corpus Christi 1965, writ ref'd n.r.e.) (court may consider construction of an agreement as shown by parties' words and conduct); *see also generally, Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex. 1982) (courts can consider facts and circumstances surrounding the execution of a contract but not to create an ambiguity where one does not exist). Accordingly, we conclude as a matter of law that the CIA's defined term "Existing Obligations" unambiguously means primary debtor level obligations. Thus, it is only when a paying Guarantor's payments on that primary obligor debt exceeds one-third of that debt amount that the other Guarantors' duty to reimburse or indemnify the Paying Guarantor arises.

Bloch nonetheless insists that a statement in the CIA's recitals supports his interpretation. That statement says that the Guarantors "desire to enter into [the] agreement to effect an equitable sharing of their risk and liability in respect of the Obligations." Bloch maintains that since "Obligations" are defined as "guaranties, indemnities, or other agreements" relating to loans or future loans, the recital reflects an intent to share individual risk (i.e., on the guaranties) rather than primary debtor's risk (i.e., on the loans).

We reject this argument for four reasons:

One, the argument is premised on misreading "Obligations" as defined in the CIA. As previously discussed, reimbursement is not required unless a Guarantor pays more than his pro rata share of the primary lender's total outstanding debt.

Two, a contract's recitals are not strictly part of the contract, and they will not control the operative phrases of the contract unless the phrases are ambiguous. *Koch v. Boxicon, LLC*, No. 05-14-01424-CV, 2016 WL 1254048, at *6 (Tex. App.—Dallas March 30, 2016, no pet.) (mem. op.). Section 2 is not ambiguous.

–16–

Three, even if we were to consider the recitals, the phrase "equitable sharing" is vague, and provides no guidance.

Finally, the recital is general, and section 2 is specific. If we perceived a conflict between the two provisions, specific provisions in a contract control over general provisions. *See G.T. Leach Builders, LLC v. Sapphire V.P.,LP,* 458 S.W.3d 502,531 (Tex. 2015). This is particularly true here where the specific provisions in the CIA are unambiguous.

Applying our reading to the Obligations at issue is straightforward.

First, the OneWest Settlement result is straightforward because Bloch never paid more than one-third of the OneWest Obligation (primary level debt) as determined at the time of the primary debtor's default. Thus, Kartsotis never had a ripe duty to either contribute to, reimburse or indemnify for, any part of Bloch's payments to OneWest. Consequently, the trial court erred as a matter of law in awarding Bloch any recovery regarding the OneWest Settlement.

Second, the Commonwealth Settlement result is straightforward because there is no record evidence of what the outstanding Commonwealth debt was when Commonwealth called on Bloch to honor his duty to pay. Absent that amount, we cannot determine whether Bloch's payment exceeded the section 2 trigger threshold. Because Bloch was required to prove his right to payment for the Commonwealth debt and he did not carry that burden, the trial court erred as a matter of law in awarding Bloch any recovery regarding the Commonwealth debt.

The Wells Fargo Settlement, however, is less clear because the amount that Bloch paid Wells Fargo to settle the lawsuit exceeds more than one-third of that debt's amount as stated on the Exhibit A "Existing Obligations" identified in the CIA. This suggests that the threshold might have been met and Kartsotis incurred a duty to contribute or indemnify Bloch for Kartsotis's one-third of Bloch's payments. But the record does not contain any evidence by which we can confirm the actual debt amount determined by the primary debtor's default. That

–17–

is, there is no record evidence of the actual amount we are to use when performing the threshold calculation. Accordingly, Bloch did not prove that he is entitled to a payment from Kartsotis regarding this debt.

For the above reasons, we agree with Kartsotis's first two issues and conclude that the trial court erred as a matter of law by awarding Bloch damages and declaratory relief based on the trial court's legally improper reading of the section 2 triggering calculation.

**2. Kartsotis's Fifth and Seventh Issues: Did the trial court err by awarding Bloch damages and by including miscellaneous expense payments in the contribution calculation?**

Kartsotis's fifth and seventh issues challenge certain items included in the trial court's damage award to Bloch. Specifically, Kartsotis argues that the CIA does not include contribution for legal fees paid to avoid liability under a Guarantor's guaranty or indemnity or or sums paid for maintenance obligations. He also argues that the evidence is insufficient to support the awards.

Bloch counters that attorney's fees and expenses are included in the amount a non-paying Guarantor must pay because these fees and expenses are payments made "in respect of" an obligation. Thus, he claims he is entitled to recover the attorney's fees he paid to defend the Commonwealth and OneWest lawsuits. He also claims he is entitled to recover payments he made for "maintenance and obligations" regarding the BBR project.

We agree with Kartsotis because there is no basis in the CIA, or any other agreement in this case, for including Bloch's miscellaneous expense payments when calculating contribution liability under the CIA. A court may not add language to a contract under the guise of interpretation. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003).[4]

---

[4] Moreover, even if these amounts were included, the contribution threshold is still not met.

–18–

Accordingly, the trial court erred as a matter of law by treating those expense items as potential CIA section 2 contribution, reimbursement, or indemnity obligations.

### 3.    Conclusion

We have previously concluded that Bloch did not prove that he was entitled to contribution on any of the BBR Settlements.  And the contribution calculation does not include attorney's fees and expenses.  Therefore, the trial court erred in granting summary judgment on Bloch's counterclaims and in awarding damages on those claims.

Based on the foregoing, we sustain Kartsotis's first, second, fifth, and seventh issues, and need not consider his sixth issue, which complains about certain evidentiary rulings that are moot given our above holdings.  *See* TEX. R. APP. P. 47.1.

**C.    Kartsotis's Fourth Issue:  Is the evidence sufficient to support the amount of Bloch's attorney's fees award?**

Kartsotis's attorney's fees argument focuses on the court's alleged reliance on fee statements that were submitted in camera.  He argues that without those statements, the evidence is insufficient to support the award.  He further complains that the award erroneously includes $44,565.50 for unrecoverable litigation expenses.

We begin with the expenses.  Expenses incurred in a lawsuit are not recoverable "unless expressly provided for by statute, rule, or under principles of equity."  *Gumpert v. ABF Freight Sys. Inc.*, 312 S.W.3d 237, 239 (Tex. App.—Dallas 2010, no pet.).  Here, the attorney's fees were awarded under chapter 37 and 38, neither of which provide for the recovery of expenses.  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.009, 38.001.

But Kartsotis does not identify the particular expenses he contends are not recoverable with specific record references.  Instead, he cites to a chart that lists only the law firm incurring the expense, a date, and an expense amount.  There is no further detail on the expenses, and without more, we cannot conclude the expenses were improper.  *See* TEX. R. APP. P. 33.1.

We next consider the sufficiency argument. Kartsotis complains that the fee statements were too heavily redacted and the attorney expert's testimony was conclusory, and therefore Bloch should not recover attorney's fees under chapter 38.

We agree with Kartsotis, but for a different reason. Because Bloch was not entitled to any recovery under the CIA, there is no basis under chapter 38 for him to recover attorneys' fees on his breach of contract claim. Therefore, the trial court erred as a matter of law in awarding Bloch any attorneys' fees under chapter 38. *See Ashford Partners, Ltd. v. ECO Res., Inc.,* 401 S.W.3d 35, 40 (Tex. 2012) (litigant must prevail on contract claim and recover damages to recover fees under the statute); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001.

But the trial court also based the attorney's fees award on chapter 37. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37. Reversal of a trial court's decision on a declaratory judgment does not necessarily require reversal of the attorney's fees award. *See City of Temple v. Taylor,* 268 S.W.3d 852, 858 (Tex. App.—Austin 2008, pet. denied). Indeed, chapter 37 provides that "the court may award costs and reasonable attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009.

And awarding attorney's fees to a non-prevailing party is not in itself and abuse of discretion. *Vincent v. Bank of Am., N.A.,* 109 S.W.3d 856, 868 (Tex. App.—Dallas 2003, pet. denied). Nonetheless, after a declaratory judgment is reversed on appeal, an attorney's fees award may no longer be equitable and just. *SAVA gumarska in Kemijska industria d.d. v. Advanced Polymer Sciences, Inc.,* 128 S.W.3d 304, 324 (Tex. App.—Dallas 2004, no pet.).

"Whether it is 'equitable and just' to award attorney's fees depends, not on direct proof, but on the concept of fairness, in light of all the circumstances of the case." *Austin Jockey Club, Ltd. v. Dallas City Limits Prop. Co., L.P.,* No. 05-14-00114-CV, 2015 WL 3549645, at *8 (Tex.

App.—Dallas June 5, 2015, pet. denied) (mem. op.) (citing *Approach Res. I, L.P. v. Clayton*, 360 S.W.3d 632, 639 (Tex. App.—El Paso 2012, no pet.).

Here, the trial court's attorney's fees award is implicitly premised on the fact that Bloch was awarded affirmative relief. The record is silent as to whether the trial court would deem the fee award equitable and just if Bloch is a not a prevailing party.

Consequently, in the interests of justice, we remand the case to the trial court to determine whether Bloch's attorney's fees should be awarded under chapter 37. *See* TEX. R. APP. P. 43.3(b); *In re A.A.L*, 2012 WL 1883763, * 4 (Tex. App.—Tyler May 23, 2012, no pet) (mem. op.).

**C.    Kartsotis's Third Issue:  Did the trial court erroneously conclude that Kartsotis's indemnity claim was a defensive issue resolved by summary judgment?**

Kartsotis's answer to Bloch's counterclaim asserted that he was entitled to indemnity under the Put Agreement.[5] After granting Bloch's summary judgment motion on his declaratory judgment and breach of contract counterclaims, the court concluded that Kartsotis's indemnity claim was resolved because it was raised as a defense to Bloch's counterclaims (and thus not as an affirmative claim for relief). Kartsotis, however, argues that the trial court erred because his indemnity claim did not accrue unless and until Bloch established liability, and therefore could not have been resolved by summary judgment.

We have concluded that Bloch did not establish Kartsotis's liability. Therefore, we need not consider this issue. *See* TEX. R. APP. P. 47.1.

---

[5] The Put Agreement provides for indemnity "from any and all claims, losses, liabilities, damages, costs, expenses, judgments, penalties, interest and any other obligations . . . ."

**D.      Bloch's First Cross-Issue:  Did the trial court err in concluding that Bloch was not entitled to Indemnity under the CIA?**

Bloch argues that the trial court erred in concluding that he was not entitled to indemnity under the CIA.  The CIA's indemnity duty, however, does not arise unless the paying Guarantor's payments on that Obligation exceed the section 2 trigger:

> Each Unpaid Guarantor hereby indemnifies any paid Guarantor, and agrees to hold such Paid Guarantor harmless from and against, any and all amounts which such Paid Guarantor shall ever be required to pay in respect of the Obligations in excess of such Paid Guarantor's Pro Rata Percentage of the Obligations.

Because we concluded above that the section 2 threshold was not met, it follows that Bloch is not entitled to indemnity for such payments.  We thus resolve Bloch's first cross-issue against him.

**E.      Bloch's Second Cross-Issue:   Did Bloch raise a fact issue regarding whether Kartsotis failed to mitigate his damages by refusing to agree to an extension of the Guaranty Bank Loan?**

Bloch raised a failure to mitigate defense in response to Kartsotis's claim for breach of the Guaranty Bank Agreement.  He now argues that the trial court erred in rejecting this defense by summary judgment.  As discussed below, we disagree with Bloch's argument because there is legally no evidence that would support (i) a duty by Kartsotis to agree to a third extension and (ii) a finding that Bloch would have performed had Kartsotis agreed to Bloch's request.

The mitigation-of-damages rule prevents a party from recovering damages that result from a breach of contract that the non-breaching party could avoid by reasonable efforts.  *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995).  Reasonable efforts are those that a party can avoid at a trifling expense or with reasonable exertions.  *Id*.  The party raising the failure to mitigate defense must prove lack of diligence as well as the amount by which the damages were increased as a result of the failure to mitigate.  *See Cocke v. White*, 697 S.W.2d 739, 744 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.).

We note at the outset that it is particularly difficult to discuss the factual basis for a summary judgment ruling without referring to the evidence that is largely sealed in this case. Nonetheless, having reviewed the evidence, sealed or otherwise, we conclude that Bloch did not raise a genuine issue of material fact concerning Kartsotis's alleged failure to mitigate.

Specifically, the essence of Bloch's claim was that Kartsotis declined his request to seek a third extension of the Guaranty Bank Loan when Bloch could not pay his share. According to Bloch, however, he could have paid the loan's remaining balance had the loan been extended for a year.

But the loan was already in default when Bloch asked Kartsotis to agree to another extension, and there is no evidence that the bank would have granted an extension. The Guaranty Bank Agreement did not obligate Kartsotis to seek or agree to an extension to give Bloch more time to satisfy his obligation. And evidence that the bank had extended the loan twice before is not evidence that it would have agreed to a third extension, particularly after the loan was in default and demand had been made for the guarantors' payments. Nor is Bloch's unsupported conclusion that the bank would have done so legally any evidence of that premise. *See Nguyen v. Citibank, N.A.*, 403 S.W.3d 927, 931 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (conclusory statements that fail to provide underlying facts supporting conclusions are not proper summary judgment evidence).

In addition, there was legally no summary judgment evidence establishing that Bloch would have been able to satisfy his debt had an extension had been granted. Bloch summarily relies on evidence that he was able to pay other debts to establish that he would also have been able to pay this one, but does not identify the specific record evidence from which such a broad inference might be drawn. He also relies on his sealed affidavit as evidence of his ability to pay.

The affidavit, however, is speculative at best. Thus, there is no evidence establishing the amount by which the damages were increased by the alleged failure to mitigate.

Therefore, on the record before us, we conclude that the trial court did not err in granting Kartsotis's summary judgment motion on Bloch's failure to mitigate defense. We thus resolve Bloch's second cross-issue against him.

**F. Bloch's Third Cross-Issue: Did Bloch raise a fact issue regarding whether Kartsotis repudiated the CIA because that agreement was incorporated into the GBA?**

Bloch's third cross-issue argues that the trial court erred in granting Kartsotis's summary judgment motion on his repudiation defense. Specifically, Bloch contends that because Kartsotis allegedly repudiated the CIA and the GBA incorporates the CIA by reference, Kartsotis repudiated the GBA. We disagree.

"A party repudiates a contract if the party manifests, by words or actions, a definite and unconditional intention not to perform the contract according to its terms." *See Chapman v. Olbrich*, 217 S.W.3d 482, 491 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *see also Builder's Sand, Inc. v. Turtur,* 678 S.W.2d 115, 120 (Tex. App.—Houston [14th Dist.] 1984, no writ). The refusal to perform must be absolute and unconditional. *See Bans Props., L.L.C. v. Housing Auth. of Odessa*, 327 S.W.3d 310, 315 (Tex. App.—Eastland 2010, no pet.).

Bloch's repudiation argument rests on communications between counsel after Kartsotis exercised his put option under the Put Agreement. Bloch contends that when counsel observed that the CIA would not survive the closing of the put option, it was evidence of an intent not to honor the CIA. But even if this were true, repudiation of the CIA does not by implication, establish repudiation of the GBA.

Incorporating the CIA into the GBA does not in this case alter the otherwise separate character and obligations of these two agreements. The GBA incorporated the CIA to remove the Guaranty Bank Loan from the Obligations controlled by the CIA. Because the parties agreed

–24–

that the CIA's terms would not govern the Guaranty Bank Loan, it follows that repudiating the CIA would not affect the obligations under the GBA.

Because Bloch did not raise a fact issue on his repudiation defense, the trial court did not err in granting Kartsotis's summary judgment motion on that defense. Accordingly, we resolve Bloch's third cross-issue against him.

## IV. Conclusion

We resolve Kartsotis's first, second, fifth, and seventh issues for him, as well as his fourth issue as it pertains to fees under chapter 38. We need not consider Kartsotis's third and sixth issues. We resolve Bloch's three cross-issues against him.

Based on the foregoing, we reverse and render in part, affirm in part, and remand to the trial court for further proceeding consistent with this opinion. Specifically, we reverse the trial court's judgment for Bloch and render judgment that Bloch take nothing for damages (specifically, reversing the damages and interest on damages awarded in paragraphs 4, 5, 6, 7, and 8 of the amended final judgment) or declaratory relief. Further, in the interests of justice, we remand the issue of Bloch's chapter 37 attorney's fees award and interest on that amount (set forth in paragraphs 4, 5, and 9 of the amended final judgment). Finally, we affirm the remainder of the judgment for Kartsotis (specifically, affirming paragraphs 1, 2, and 3 of the amended final judgment).

/Bill Whitehill/
BILL WHITEHILL
JUSTICE

141294F.P05

–25–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

TOM KARTSOTIS, Appellant

No. 05-14-01294-CV      V.

RICHARD L. BLOCH, INDIVIDUALLY
AND AS A TRUSTEE OF THE RICHARD
AND NANCY BLOCH FAMILY TRUST,
AND NANCY BLOCH AS A TRUSTEE
OF THE RICHARD AND NANCY BLOCH
FAMILY TRUST, Appellees

On Appeal from the 134th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-11-04489.
Opinion delivered by Justice Whitehill.
Justices Myers and Stoddart participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that: RICHARD L. BLOCH, INDIVIDUALLY AND AS A TRUSTEE OF THE RICHARD AND NANCY BLOCH FAMILY TRUST, AND NANCY BLOCH AS A TRUSTEE OF THE RICHARD AND NANCY BLOCH FAMILY TRUST take nothing for damages or declaratory relief. The trial court's award of attorney's fees and interest under Chapter 38 to RICHARD L. BLOCH, INDIVIDUALLY AND AS A TRUSTEE OF THE RICHARD AND NANCY BLOCH FAMILY TRUST, AND NANCY BLOCH AS A TRUSTEE OF THE RICHARD AND NANCY BLOCH FAMILY TRUST is **REVERSED** and the case is **REMANDED** to the trial court to determine whether such fees should be awarded to RICHARD L. BLOCH, INDIVIDUALLY AND AS A TRUSTEE OF THE RICHARD AND NANCY BLOCH FAMILY TRUST, AND NANCY BLOCH AS A TRUSTEE OF THE RICHARD AND NANCY BLOCH FAMILY TRUST under Chapter 37. The judgment of the trial court for TOM KARTSOTIS is **AFFIRMED**.

It is **ORDERED** that appellant TOM KARTSOTIS recover his costs of this appeal from appellees RICHARD L. BLOCH, INDIVIDUALLY AND AS A TRUSTEE OF THE RICHARD AND NANCY BLOCH FAMILY TRUST, AND NANCY BLOCH AS A TRUSTEE OF THE RICHARD AND NANCY BLOCH FAMILY TRUST.

Judgment entered September 2, 2016.