**Affirmed and Opinion Filed February 17, 2017**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-16-01084-CV
_____

## IN THE INTEREST OF N.G.G., N.M.G., AND N.G.G., CHILDREN

**On Appeal from the 301st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-12-06967**

## MEMORANDUM OPINION

Before Justices Bridges, Lang-Miers, and Whitehill
Opinion by Justice Whitehill

Glenn Green ("Father") appeals from a judgment terminating his parental rights as to his three children with appellee Marilynn Green ("Mother"). Father raises five issues, each attacking the sufficiency of the evidence in some respect. We overrule his second and fifth issues and do not address his other issues. Because our rulings on issues two and five dispose of the appeal, we affirm the judgment.

### I. BACKGROUND

#### A. The Record

At the outset, we note that the final judgment includes an order "that all papers and records in this case, including the minutes of the Court, be sealed." Because this is an action originally arising under the family code, Rule 76a's sealing procedures do not apply. *See* TEX.

R. Civ. P. 76a(2)(a)(3), 76a(9); *In re Bain*, 144 S.W.3d 236, 241 (Tex. App.—Tyler 2004, orig. proceeding).

But we must hand down a public opinion explaining our decision based on the record. *See* Tex. R. App. P. 47.1, 47.3; *Kartsotis v. Bloch*, No. 05-14-01294-CV, 2016 WL 4582208, at *2 (Tex. App.—Dallas Sept. 2, 2016, pet. filed). We cannot do this without describing, to some extent, the pleadings, evidence, findings, and judgment in the case. "To the extent we include any sensitive information in this memorandum opinion, we do so only to the degree necessary to strike a fair balance between the parties' interest in keeping portions of the record confidential and our responsibilities to the public as an appellate court." *TMX Fin. Holdings, Inc. v. Wellshire Fin. Servs., LLC*, No. 01-16-00044-CV, 2016 WL 5920776, at *1 n.1 (Tex. App.—Houston [1st Dist.] Oct. 11, 2016, no pet. h.).

## B.      Procedural History

### 1.      Pretrial

Father and Mother were divorced on 31 July 2013. They had three children, all younger than thirteen at the time: a son (N.G.G.) and two younger daughters (N.M.G. and daughter N.G.G.). The divorce decree made Mother sole managing conservator and made Father possessory conservator. However, the order barred Father from access to N.M.G. or son N.G.G. until a pending criminal matter was resolved and a treating therapist recommended that access would be in the children's best interest. The order gave Father limited supervised visitation with daughter N.G.G.

In November 2013, Father filed a motion to modify the parent–child relationship, alleging among other things that the criminal matter against him had been resolved. He requested a joint managing conservatorship.

Mother answered, opposing the relief Father sought.

In March 2016, Mother filed a pleading entitled "Second Amended Counter-Petition to Modify Parent–Child Relationship and Original Petition to Terminate Parent–Child Relationship." She sought to terminate Father's parent–child relationship with all three children.

Father then filed a counter-petition to terminate Mother's parental rights, in addition to his motion to modify.

The parties' live pleadings at the time of trial were Mother's "Third Amended Counter-Petition to Modify Parent–Child Relationship and Original Petition to Terminate Parent–Child Relationship" and Father's "Third Amended Motion to Modify and Fourth Amended Petition to Terminate Parent–Child Relationship." However, the trial court struck the part of Father's live pleading in which he requested termination of Mother's parental rights.

## 2. Trial and Posttrial

The jury trial in this case lasted five days.

Jury questions one, two, and three asked whether Father's parental rights should be terminated as to son N.G.G. and daughters N.M.G. and N.G.G. respectively. The jury answered each of these questions "yes." The jury did not answer the next six questions, which concerned potential conservatorship changes as between Mother and Father. The last two questions concerned attorneys' fees. The jury awarded fees to Mother and awarded no fees to Father. The verdict was unanimous.

After trial, the trial judge signed an order terminating Father's parent–child relationships with all three children. The order also awarded Mother fees.

Father filed a new trial motion and statement of points on appeal. There is no indication that the trial court ever heard or ruled in writing on Father's new trial motion. Father timely appealed.

## II. ANALYSIS

**A.** **Issues One Through Three: Was the evidence legally insufficient as to the three grounds for termination presented to the jury?**

### 1. Clarifying the Issues

Father's issues and arguments are not entirely clear. To clarify his issues, we first quote his first three issues and then compare them to the jury charge and findings.

Father's first three issues are:

I.     Whether the lower court erred in issuing a jury instruction that a prior order denying termination was rendered on July 31, 2013, and that the circumstances of the [sic] each of the three children or of a parent had materially and substantially changed since July 31, 2013?

II.    Whether the lower court erred in issuing jury instruction[s] that the Appellant failed to support each child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition to terminate?

III.   Whether the lower court erred in issuing jury instructions that the Appellant had been placed on deferred adjudication community supervision, for being criminally responsible for the serious injury of any of [sic] a child under Texas Penal Code § 22.01?

These issues seem to assume that the trial court instructed the jury that certain facts were true—for example, that a prior order denying termination was rendered on 31 July 2013.

That premise, however, is incorrect; the jury charge actually submitted questions asking the jury to decide the facts addressed in Father's first three issues. The first three jury questions were identical except for the children's names, so we will quote only question one, which concerned son N.G.G.:

SPECIAL INSTRUCTION FOR QUESTION NUMBER 1

In answering QUESTION NUMBER 1, you are instructed that you must answer QUESTION NUMBER 1 "No" unless you find by clear and convincing evidence:

That the Father, GLENN GREEN failed to support [son N.G.G.] in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition; **OR**

–4–

That GLENN GREEN has been placed on deferred adjudication community supervision, for being criminally responsible for the serious injury of a child under the following sections of the Penal Code: Section 22.01 (Assault); **OR**

That a prior order denying termination was rendered on July 31, 2013, that the circumstances of [son N.G.G.] or of a parent has materially and substantially changed since July 31, 2013, and that, before July 31, 2013, GLENN GREEN engaged in conduct that endangered the physical or emotional well-being of [son N.G.G.]

**AND**

You must answer QUESTION NUMBER 1 "No" unless you find by clear and convincing evidence that termination of the parent child relationship between the Father, GLENN GREEN and the child, [son N.G.G.] is in the child's best interest. Otherwise you must answer QUESTION NUMBER 1 "Yes".

QUESTION NUMBER 1

Do you find by clear and convincing evidence that the parent-child relationship between the parent GLENN GREEN and the child [son N.G.G.] should be terminated?

ANSWER "YES" OR "NO".

ANSWER _____

The jury answered all three questions "Yes."

Thus, the assumption underlying Father's first three issues as written is incorrect; the trial court did not instruct the jury to take the particular facts as true.

Mother addresses Father's erroneous assumption and argues that we should overrule Father's first three issues because they are based on incorrect factual premises.

But Father's arguments under those issues, liberally construed, argue that the evidence was legally insufficient to support submitting each of the three disjunctive paragraphs appearing as "special instructions" before questions one through three. His reply brief confirms that he intended his original brief to raise no evidence challenges to the jury's findings. We will review the substance of Father's arguments. *See Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) (per curiam) ("Appellate briefs are to be construed reasonably, yet liberally, so that the right to

–5–

appellate review is not lost by waiver. . . . Simply stated, appellate courts should reach the merits of an appeal whenever reasonably possible.").

### 2. Error Preservation

Mother argues that Father did not preserve his first three issues.

Father timely filed a new trial motion in which he raised the sufficiency challenges comprising his first three issues' substance. Accordingly, these issues are preserved for review. *See DFW Aero Mechanix, Inc. v. Airshares Incorporated, Inc.*, 366 S.W.3d 204, 206 (Tex. App.—Dallas 2010, no pet.).

### 3. Standard of Review

A termination of parental rights must be supported by clear and convincing evidence. *In re N.T.*, 474 S.W.3d 465, 474–75 (Tex. App.—Dallas 2015, no pet.). Clear and convincing evidence is the measure or degree of proof that will produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE § 101.007.

Our standard of review reflects the elevated burden of proof at trial. *In re N.T.*, 474 S.W.3d at 475. In assessing the evidence's legal sufficiency, we must consider all the evidence and determine whether the fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proved. *Id*. We defer to the fact-finder's credibility determinations and view the evidence in the light most favorable to the finding. *Id*. We assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could have done so, and we disregard all evidence that a reasonable fact-finder could have disbelieved or found incredible. *Id*. If no reasonable fact-finder could form a firm belief or conviction that the matter to be proven is true, the evidence is legally insufficient. *In re K.M.L.*, 443 S.W.3d 101, 113 (Tex. 2014).

### 4. Applicable Law

As to each child, three different termination theories were submitted to the jury by a single broad form question instructing that the jury could find in favor of termination if it found by clear and convincing evidence any one of the following alternative termination theories:

One, Father had failed to support the child in accordance with his ability for one year ending within six months of Mother's petition's filing date and termination was in the child's best interest. *See* FAM. § 161.001(b)(1)(F), (b)(2).

Two, Father was placed on deferred adjudication community supervision for being criminally responsible for the serious injury of a child under penal code § 22.01 and termination was in the child's best interest. *See id.* § 161.001(b)(1)(L)(v), (b)(2).

Third, a prior order denying termination was rendered on 31 July 2013, the circumstances of the child or a parent materially or substantially changed after that date, Father engaged in conduct that endangered the child's physical or emotional well-being before that date, and termination was in the child's best interest. *See id.* § 161.004(a)(1)–(4).

Because of the broad form submissions, Father's first three issues fail if the evidence is sufficient to support any one of the three specific termination theories submitted to the jury: § 161.001(b)(1)(F), § 161.001(b)(1)(L)(v), or § 161.004(a)(1)–(3). *See In re A.V.*, 113 S.W.3d 355, 363 (Tex. 2003).

### 5. Is there sufficient evidence of the termination ground based on failure to provide support?

We first consider the ground that Father failed to support the children according to his ability for one year ending within six months before the termination petition was filed. *See* FAM. § 161.001(b)(1)(F). Mother filed her termination petition on 17 March 2016, so we ask whether there was sufficient evidence, reviewed under the clear and convincing standard, of a one-year

period of such nonsupport in accordance with Father's ability sometime between 17 September 2014 and 17 March 2016.

Mother based her failure to support theory on Father's failure to pay his share of the children's unreimbursed medical expenses. The divorce decree required Father to pay Mother half of the children's unreimbursed medical expenses. Mother testified that Father did not pay his share of those expenses after February 2014. By the time of trial, Father's unpaid share of the expenses was $9,345.31. Mother also introduced an exhibit showing the timing of those expenses. The exhibit indicates that Father was almost $5,000 in arrears on the expenses when the relevant period began on 17 September 2014. Over $2,400 in additional expenses accrued from 17 September 2014 to 17 March 2016. Thus, there was evidence that during the relevant period Father did not pay his share of unreimbursed medical expenses as ordered.

A showing of Father's ability to pay is also essential under § 161.001(b)(1)(F). *See id.*; *In re J.R.E.H.*, No. 05-00-01248-CV, 2002 WL 1380321, at *3 (Tex. App.—Dallas June 27, 2002, pet. denied) (not designated for publication) ("[T]he ability to pay support must exist each month during the twelve-month period."). Mother introduced two Fidelity Investments statements showing that Father owned an IRA containing slightly over $217,000 in both January 2014 and February 2016.

She also introduced monthly statements showing that Father owned an IRA with TD Ameritrade. From February 2015 through March 2016, that account's monthly balance fluctuated between roughly $26,000 and roughly $30,000.

And Mother also introduced a statement regarding a different, non-IRA TD Ameritrade account in Father's name showing that over $247,000 was withdrawn from that account in January 2014. Mother further testified that Father claimed that he spent all that money, but she was never able to get proof of where that money went.

Additionally, Mother introduced Father's credit card records showing that he made some sizable credit card payments during 2015, including payments totaling almost $1,600 in March, payments totaling over $600 in April, payments totaling $5,100 in May, and payments totaling $3,000 in November.

The jury could have credited all of the foregoing evidence. That evidence supported the conclusions that (i) Father could have paid his court-ordered share of the children's unreimbursed medical expenses for twelve months during the relevant eighteen-month time period and (ii) he did not do so.

We must consider all the evidence, deferring to the jury's credibility determinations and disregarding contrary evidence if a reasonable fact-finder could have done do. *See In re N.T.*, 474 S.W.3d at 475. So we next consider the evidence Father relies on.

First, he points to evidence that he was unemployed. But Mother's evidence showed that he had access to investment accounts holding amounts far in excess of his medical support obligations, and also that he made credit-card payments over the course of 2015 in excess of those obligations.

Second, Father argues that the divorce decree's allocation of the unreimbursed medical expense obligation was unfair in light of the parties' disparate earnings. But that argument misses the point. The question is whether Father failed to support the children according to his ability, not whether the original allocation of unreimbursed medical expenses between the parties was fair.

Third, Father refers to his testimony that he pre-paid about $3,800 towards his obligations for child support and medical insurance. He argues that had this amount been applied to his share of the two daughters' unreimbursed medical expenses, he would not have been in arrears as to the daughters. But Father cites no evidence showing if or when the allegedly pre-paid funds

were ever forwarded to Mother or to medical providers that were owed unreimbursed medical expenses. He also cites no evidence that the allegedly pre-paid funds could have been applied to any liability other than what they were supposedly paid towards—Father's child support and medical insurance obligations.[1]  The jury rationally could have rejected Father's unsupported contentions that the alleged pre-payments were or could have been applied to Father's unreimbursed medical expense obligation. Accordingly, we reject Father's argument.

Fourth, Father points to his testimony that he himself obtained medical insurance for the children under which he and Mother "wouldn't have to pay a dime." He admitted into evidence insurance cards (dated March 2014) that he allegedly procured for the children. But the divorce decree ordered Mother to maintain the children's medical insurance, and it ordered Father to pay half of the children's unreimbursed medical expenses. The jury was not required to credit Father's testimony that he obtained medical insurance for the children that would have paid 100% of their medical expenses. The jury was entitled to credit Mother's testimony that there were unreimbursed medical expenses and that Father did not pay his share of them. *See id.* (we defer to the fact-finder's credibility determinations).

Finally, Father asserts that he could not pay Mother the unreimbursed medical expenses directly because (i) the divorce decree enjoined him from communicating with her and (ii) Mother redacted the medical bills so much that he could not verify the legitimacy or the amounts of the bills. But the divorce decree provided that Mother would provide Father with "uncovered medical expenses receipts . . . through Our Family Wizard." And there was other evidence that "Our Family Wizard" was a website and that Father did not log on to Our Family Wizard after 2014. Moreover, there was evidence that on at least one occasion Father paid Mother for

---

[1] Father asserts that it was "contrary to law" not to apply the pre-paid funds to the unreimbursed medical expenses, but he cites no supporting authority.

–10–

medical expenses by having his attorney send a money order to Mother's attorney. The jury thus rationally could have rejected Father's theory that it was impossible for him to pay the unreimbursed medical expenses as ordered.[2]

We conclude that based on the record evidence the jury could reasonably form a firm belief or conviction that Father failed to support the children according to his ability during a one-year period ending within six months before Mother filed her termination petition. *See id.* Accordingly, we overrule Father's second issue and need not discuss his first or third issues. *See In re A.V.*, 113 S.W.3d at 363.

**B.     Issue Four:  Was the evidence legally or factually insufficient to show that Father caused serious injury to any of the children?**

Father's fourth issue reads, "Whether the lower court erred in finding the evidence factually and legally sufficient that [son N.G.G.], or either of the other children, suffered serious injury *as a result of* the Appellant's deferred adjudication community supervision?" (Emphasis added.)  But Father's argument clarifies that he is simply attacking the sufficiency of the evidence that he caused serious injury to any of his children, as is necessary to support termination under § 161.001(b)(1)(L).

We need not address this issue because we have already concluded that the evidence is sufficient to support a different termination ground, namely failure to provide support under § 161.001(b)(1)(F). *See In re A.V.*, 113 S.W.3d at 363.

**C.     Issue Five: Was the evidence legally or factually insufficient to show that termination of Father's parental rights was in the best interest of each child?**

**1.     Standard of Review**

We have already stated the legal sufficiency standard of review.

---

[2] Father's reply brief contains new arguments complaining about the admission of Mother's Exhibit 16 concerning the medical expenses. We do not consider arguments raised for the first time in a reply brief. *Sanchez v. Martin*, 378 S.W.3d 581, 590 (Tex. App.—Dallas 2012, no pet.).  Moreover, Father relied on that exhibit in his opening brief.

–11–

In reviewing the evidence for factual sufficiency, we must consider all the evidence and determine whether the fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proved. *In re N.T.*, 474 S.W.3d at 475. We defer to the fact-finder's credibility determinations. *Id.* In a termination case, we ask whether, in light of the entire record, the fact-finder could reasonably form a firm conviction about the particular allegation's truth. *Id.* We must consider whether the disputed evidence is such that a reasonable fact-finder could not have reconciled the disputed evidence in favor of its finding. *Id.* If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction about the allegations' truth, then the evidence is factually insufficient. *Id.*

### 2. Applicable Law

An essential element for terminating parental rights is that the termination is in the child's best interest. FAM. § 161.001(b)(2). This element must be proved by clear and convincing evidence. *Id.*

The supreme court has identified some factors that may be relevant to the best interest determination, such as (i) the child's desires, (ii) the child's present and future emotional and physical needs, (iii) present and future emotional and physical danger to the child, (iv) the parent's parental abilities, (v) the programs available to assist a parent promote the child's best interest, (vi) the parent's plans for the child, (vii) the stability of the home, (viii) the parent's acts or omissions that may indicate the parent–child relationship is not a proper one, and (ix) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The list is not exclusive. *Id.* at 372. The jury charge in this case instructed the jury on the *Holley* factors.

The evidence that termination is in a child's best interest can be sufficient even if the evidence does not address all nine *Holley* factors. *See In re C.M.B.*, 204 S.W.3d 886, 895 (Tex. App.—Dallas 2006, pet. denied).

Our focus is the child's best interest, not the parent's best interest. *In re M.V.*, 343 S.W.3d 543, 548 (Tex. App.—Dallas 2011, no pet.).

### 3.       Evidence to be Considered

Much of the evidence relevant to the best interest analysis concerned events that occurred before the 31 July 2013 divorce decree was signed.

Although Father's fifth issue does not complain about the admission of that evidence, Father's first issue asserts that "any evidence regarding events occurring prior to the divorce should not have been admissible pursuant to Tex. Family Code § 161.004(b)." Assuming that Father intends this assertion to apply to his fifth issue as well (which we do), he does not give any record references showing that he objected to the various witnesses' testimony about pre-divorce events. Our record review does not reveal any objections to that testimony based on family code § 161.004(b). Thus, any complaint that testimony about pre-divorce events was inadmissible under § 161.004(b) was not preserved. *See* TEX. R. APP. P. 33.1(a).

### 4.       Application of the Law to the Facts

As discussed below, the evidence of Father's erratic and abusive behavior before the divorce is relevant to several *Holley* factors because it tends to show that he was not able to meet the children's physical and emotional needs, he was dangerous to their physical and emotional well-being, he had poor parental abilities, and he was unable to provide a stable home. Accordingly, we summarize that evidence first, and then discuss other evidence bearing on specific *Holley* factors.

–13–

### a.    Father's Conduct

Mother testified to the following facts:

At first Father was abusive towards Mother; later, he began to abuse the children too.  For example, in August 2009, Father started hitting Mother in the middle of the night, and she ran away from the house.  The police were called, but Father successfully pressured Mother into recanting.  Father threatened to kill Mother more than once during the course of their marriage.

Father was "hyperfocused" on the children being the best and winning at martial arts.  Once he hit son N.G.G. in the head with a belt buckle because he did not perform well at a competition.

On another occasion, Father lost his temper over one of son N.G.G.'s school grades.  He threw a pile of books at Mother, hitting her in the head.  Then he chased her around the kitchen with a knife, in front of the two older children.  Then he "dug" the knife into the kitchen table and yelled for the children to go upstairs.  They and Mother ran upstairs.  Mother and N.M.G. went into a bedroom, and Father hit N.M.G. on the head twice.  N.M.G. fell down, and it appeared that Father was going to kick her but he did not.

In March 2012, Mother saw Father beat son N.G.G. over the head with a metal broomstick.  She saw knots on the back of son N.G.G.'s head, gave him Tylenol, and checked on him throughout the night.

Father hit son N.G.G. a lot, using his fist on some occasions.

On one occasion, Father poked N.M.G. in the side with an open pocket knife.  When daughter N.G.G. was four or five years old, Father would "open a pocket knife and show it to her, flick it at her" if she misbehaved.  He sometimes threatened daughter N.G.G. with needles if she misbehaved.

Father repeatedly called son N.G.G. "retarded." He also verbally abused the children with vulgar epithets.

Father wanted to buy some guns, but he did not want to do so in his own name, so he had Mother buy four guns for him. On one occasion, Mother saw Father aim a gun at daughter N.G.G.'s forehead with a laser finder. N.M.G. reported to Mother that Father had pointed AR-15s at her and at son N.G.G. On another occasion, Father shot a flip-flop off N.M.G.'s foot with a BB gun.

He was always concerned that someone was trying to poison the children and that doctors were trying to hurt them. He also thought that Mother was trying to kill him by poisoning his food. To get him to eat, Mother would prepare two plates that were substantially the same and give Father his choice, because otherwise he would think she had done something to his plate.

Mother testified that she did not believe that Father can change enough to not abuse others in his household.

### b. The Children's Desires

Shareen Wornson, a licensed professional counselor supervisor, testified that she saw the children three times a week for a while, and then she saw them about every other month for the year leading up to trial. She last saw them the week before trial. She testified that all three children expressed a desire not to have a relationship with Father.

Father argues that a different witness, Dr. Aaron Robb, testified that daughter N.G.G. responded very positively to Father during the supervised visits he observed. But Wornson testified that in her sessions with daughter N.G.G., the girl did not express a desire to see Father, and she expressed the opposite through "play therapy." Daughter N.G.G. generally would not speak about Father during therapy, but the one time she did, she said that she did not want to

have visits with him anymore. Also, the evidence shows that Wornson had contact with daughter N.G.G. after Robb's last contact with her and Father.

The jury was entitled to credit Wornson's testimony and conclude that, at the time of trial, the children desired to have no further relationship with Father. The jury could rationally conclude that the first *Holley* factor weighs in favor of termination.

### c. Emotional and Physical Needs and Dangers

We will consider together the next two *Holley* factors, concerning the children's needs and potential dangers to them. Mother's testimony about Father's erratic and abusive behavior supports termination as to these factors. So does the following additional evidence.

#### Daughter N.G.G.

As to daughter N.G.G., Wornson testified that while the girl was having supervised visitation with Father, she remained very closed off and not very interactive during therapy. But she later became more open, more interactive, and displayed "more relationship-based, nurturing-based play than she had previously." Wornson also testified that on one occasion, during a joint therapy session with all three children, daughter N.G.G. told the other two children to stop talking about Father because she was afraid Father would find out they were talking about him and would get mad.

Mother testified that daughter N.G.G. had less anxiety and was more carefree after the supervised visits with Father stopped.

#### Daughter N.M.G.

The evidence showed that daughter N.M.G. talked to Wornson about Father's "paranoia" and the negative effects it had on her life. N.M.G. also told Wornson about what N.M.G. perceived to be Father's abusive behavior, and she gave specific incidents. According to Wornson, N.M.G. correctly blamed the incidents on Father and not on herself. N.M.G. also

discussed the many positive things the family had been able to do since being separated from Father. However, Mother explained that when Father was present, the two older children participated in jujitsu, and otherwise the children did not participate in any activities.

Of the children, N.M.G. was the most adamant that she wanted no relationship with Father even if he got help in counseling.

## Son N.G.G.

Wornson testified that son N.G.G. manifested post-traumatic stress disorder symptoms. In a March 2014, Wornson said that son N.G.G. struggled considerably from the negative effects of Father's verbal, emotional, and physical abuse. She also wrote that son N.G.G. displayed intense fear and helplessness regarding Father, and he suffered from suicidal ideation. Wornson added that she believed son N.G.G. would suffer tremendously if he were forced to see Father, and he might harm himself.

## Alexandra Doyle

Additionally, psychologist Alexandra Doyle testified to facts bearing on these *Holley* factors. She was a court-appointed psychologist in this case and saw each child about 50 times, including about ten times after the divorce. She testified that the children would be "very emotionally disturbed" and "scared for their physical safety" if Father were to have contact with them in the future. She also testified that son N.G.G. would become more seriously mentally ill and that N.M.G. would probably run away.

## Conclusion

We conclude that the jury could reasonably conclude from the above that there was clear and convincing evidence to support these *Holley* factors.

### d. Father's Parental Abilities and the Stability of the Home

We will consider these *Holley* factors together. Mother's testimony about Father's erratic and abusive behavior supports termination as to these factors. So does the following additional evidence.

### Doyle

Doyle testified to the following facts: In 20 years of doing this kind of psychological work, this was "the worst, most dangerous case" she had ever worked on because of Father. Father was "very smart" and "very resourceful," and yet he had

> no understanding about what the problem is here, not one bit of understanding why these kids are distressed, no ability to empathize with the children, understand their developmental needs or how things might be scary to them. There is no insight whatsoever. A lot of anger and a lot of blame.

She added that his behaviors were "more consistent with a thinking disorder, which is more like the schizophrenias," and "[t]here is a lot of paranoia here." Doyle further explained that a thinking disorder is "really an inability to see reality the way other people do." People with thinking disorders and paranoia usually cannot be treated because they never take responsibility, they usually refuse medication, and they refuse any effort to get them to think about things differently.

Doyle also opined that Father "appears to have a very serious mental illness that makes it very difficult for him to understand both the needs of the children and to really be able to conform his behavior according to rules and regulations."

Doyle further testified that the children expressed concern that Father did not understand and act appropriately during basic social activities, such as the children's jujitsu exhibitions.

Finally, Doyle testified that she withdrew from the case because Father's therapist told her she needed to withdraw because it was dangerous and because Father was very focused on her and wanted to do something to her, at least professionally.

–18–

## Linda Rollins Threats

Family therapist Linda Rollins Threats worked with the family from around March 2014 to July 2014. She testified that Father tends to react with anger when his views are challenged, he can be hypersensitive to perceived thoughts, and he sometimes overreacts based on insecurities and his emotional reasoning.

## Aaron Robb

Licensed professional counselor Aaron Robb worked for the agency that was appointed to supervise Father's visits with daughter N.G.G. He testified that "issues" were noted during at least four of Father's visits. These problems included intrusive questioning of the child, inappropriate conversations with the person supervising the visit, attempts to misrepresent things and mislead the supervisors, and texting during the visit. At some point, Father stopped exercising his supervised possession of daughter N.G.G.

Robb further testified that there were "various odd and bizarre interactions" with Father, and that at one point Father claimed there was a "conspiracy of all women against him, including [Robb's] female staff, mother's female attorney, and the female judge involved with the case."

## Father's Evidence

Father argues that there was evidence that he (i) was ahead in his child support payments; (ii) took classes on anger management and parenting and (iii) had some successful supervised visits with daughter N.G.G. It was the jury's province to assess this evidence and give it appropriate weight in the best-interest analysis. We conclude that this evidence was not so compelling that the jury could not rationally reach the results it did.

Father also points out that Threats testified that she would not have recommended terminating his parental rights. But Threats also testified that she did not do a custody evaluation in this case, and that she could not make a recommendation on termination one way or the other.

Given the entirety of the evidence, the jury could reasonably conclude that there was clear and convincing evidence that Father had poor parenting abilities and could not provide a stable home.

### e.    Other *Holley* Factors

The evidence does not bear strongly on the other *Holley* factors.

The evidence is equivocal about the availability of programs to help Father promote the children's best interest. Father points to evidence that he completed court ordered and other anger management and parenting classes. But there was also evidence that Doyle and Robb found Father difficult or impossible to work with in the contexts of therapy and supervised visitation.

## Conclusion

Given the totality of the evidence, the jury reasonably could have formed a firm conviction or belief that terminating Father's parental rights was in each child's best interest. Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's findings to that effect. We overrule Father's fifth issue.

## III.  DISPOSITION

For the foregoing reasons, we affirm the trial court's judgment.

/Bill Whitehill/
BILL WHITEHILL
JUSTICE

161084F.P05

–20–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF N.G.G., N.M.G., AND N.G.G., CHILDREN

No. 05-16-01084-CV

On Appeal from the 301st Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-12-06967.
Opinion delivered by Justice Whitehill. Justices Bridges and Lang-Miers participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Marilynn Green recover her costs of this appeal from appellant Glenn Green.

Judgment entered February 17, 2017.