**Affirmed in Part, Reversed and Remanded in Part, and Memorandum Opinion filed October 26, 2023.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-22-00264-CV

---

### PARVIZIAN FINE ORIENTAL RUGS, INC., Appellant

### V.

### ECLECTIC DESIGN, LP, Appellee

---

**On Appeal from the 151st District Court
Harris County, Texas
Trial Court Cause No. 2019-31899**

---

## MEMORANDUM OPINION

Parvizian Fine Oriental Rugs, Inc. appeals from a summary judgment favoring Eclectic Design, LP. Eclectic sued Parvizian for breach of a commercial lease agreement. Pursuant to the lease and a subsequent rent deferral agreement, the trial court awarded Eclectic damages for unpaid rent minus rent paid by replacement tenants, the cost to prepare the space for the new tenants, brokers' fees for finding new tenants, and deferred rent from earlier in the lease term. The total

damages awarded amounted to $447,984.52. The trial court also awarded Eclectic attorney's fees of $147,834.89.

In its first four issues, Parvizian asserts that a genuine issue of material fact exists regarding (1) the calculation of damages, (2) the defenses of release and novation, (3) the reasonableness of Eclectic's mitigation efforts, and (4) the defenses of force majeure and impossibility. In its fifth and sixth issues, Parvizian asserts that as a matter of law, the damages and force majeure clauses in the lease were unconscionable. We reverse and remand a portion of the damages award and the attorney's fees award for recalculation of those damages and fees. We affirm the remainder of the judgment.

## *Background*

In March 2016, Parvizian and Eclectic entered into a commercial lease agreement with a five-year term. Parvizian agreed to pay "minimum rent" calculated on a per square foot basis, which resulted in rent for the first year of $15,767.50. Rent was to increase each subsequent year of the lease. Parvizian also agreed to pay "additional rent" to cover maintenance of common areas, taxes, and insurance. A failure to pay rent when due constituted a default under the lease terms. In the event of a default, the lease permitted Eclectic to repossess the premises without terminating the lease. As for remedies in the event of a default, in addition to the remaining unpaid rent for the lease term, the lease made Parvizian liable for "any brokers' fees . . . in connection with re-letting the whole or any part of the Premises," "the cost of repairing, altering, remodeling, or otherwise putting the Premises into a condition acceptable to such [new] tenant or tenants," and "all expenses incurred by Landlord in enforcing Landlord's remedies, including, but not limited to, costs of court and attorneys' fees."

In 2017, Gus Parvizian, the president and principal owner of Parvizian,

began experiencing health problems. In September of that year, the parties entered into a rent deferral agreement that permitted Parvizian to temporarily pay less in rent but then required it to pay higher rent later during the lease term to cover the deferred amounts. Gus Parvizian died a short time later.

By June 2018, Parvizian was conducting a liquidation sale overseen by Amir Mireskandari, who allegedly informed Eclectic's president, Mihir Mody, that the liquidation would be completed within 90 days.[1] Eclectic began looking for a replacement tenant or tenants and eventually signed lease agreements with Abraham's Oriental Rugs and Bath Floor Décor LLC through the use of brokers. Construction then began to divide the premises formerly occupied by Parvizian into two separate spaces for the new tenants. Abraham's Rugs began paying rent in March 2019, and Bath Floor Décor began paying rent in July of that year.

As stated, Eclectic sued Parvizian for breach of the lease agreement and moved for a traditional summary judgment. Among its summary judgment evidence, Eclectic presented an affidavit by Mody, the lease agreement, the rent deferral agreement, letters and emails, receipts for broker fees, receipts and invoices related to remodeling of the lease space, Parvizian's discovery responses, and an affidavit on fees by Eclectic's attorney. In response, Parvizian offered an affidavit by Mireskandari and a large set of documents Eclectic produced in discovery, which included many of the same documents Eclectic attached to its motion.

Eclectic requested the trial court award it broker fees of $60,210, $125,563.55 for the remodeling of the space into two units, the rent differential of $236,127.89 between what Parvizian owed on the remainder of the lease

---

[1] Although Mireskandari's role with Parvizian is not entirely clear from the record, it appears that he was Gus Parvizian's brother-in-law and was hired to conduct the liquidation.

agreement and the new tenants paid as rent, and $26,083.08 for the remaining rent deferral balance. Eclectic also requested $147,834.89 in attorney's fees. The trial court granted all of Eclectic's requests and ordered Parvizian to pay $447,984.52 in total damages plus the attorney's fees.

### *Standards of Review*

We review a grant of summary judgment de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review the evidence presented in the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).

The party moving for traditional summary judgment bears the burden of showing no genuine issue of material fact exists and it is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018). If the movant carries this burden, the burden shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007). In reviewing the grant of summary judgment, we must credit evidence favoring the nonmovant, indulging every reasonable inference and resolving all doubts in his or her favor. *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995).

A breach of contract claim requires proof of (1) the existence of a valid contract, (2) the plaintiff's performance or tender of performance, as the contract

4

required, (3) the defendant's breach by failure to perform, and (4) damages sustained by the plaintiff as a result of the breach. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018).

## *Discussion*

We will begin our analysis by addressing Parvizian's fifth and sixth issues, asserting that clauses in the lease were unconscionable as a matter of law, as those issues would afford Parvizian greater relief than its other issues. *See Downing v. Burns*, 348 S.W.3d 415, 421 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("Before addressing those issues that would result only in remand, we must first consider the points on which we could render judgment."). We will then turn to Parvizian's second issue, concerning the defenses of release and novation; third issue, concerning the reasonableness of Eclectic's mitigation efforts; and fourth issue, concerning the defenses of force majeure and impossibility. Lastly, we will consider Parvizian's first issue, which challenges the trial court's calculation of damages.

## I. Unconscionability

In its fifth and sixth issues, Parvizian argues that the damages and force majeure clauses in the lease are unconscionable as a matter of law. Whether a contract is unconscionable is a question of law. *See In re Poly-Am., L.P.*, 262 S.W.3d 337, 349 (Tex. 2008). "Unambiguous contracts . . . are presumed to reflect the intent of the contracting parties and are generally enforced as written 'regardless of whether one or more of the parties contracted wisely or foolishly, or created a hardship for himself.'" *Venture Cotton Co-op. v. Freeman*, 435 S.W.3d 222, 228 (Tex. 2014) (quoting *Wooten Props., Inc. v. Smith*, 368 S.W.2d 707, 709 (Tex. Civ. App.—El Paso 1963, writ ref'd)). Texas courts therefore do not usually inquire into the reasons the parties chose particular terms or the relative fairness of

those terms. *See id.* That said, equally compelling is the notion that grossly unfair bargains should not be enforced. *See id.* Accordingly, legally unconscionable contracts are unenforceable under Texas law. *In re Poly-Am.*, 262 S.W.3d at 348. "A contract is unenforceable if, 'given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract.'" *Id.* (citing *In re FirstMerit Bank*, 52 S.W.3d 749, 757 (Tex. 2001)). Factors in determining whether a contract is unconscionable can include gross disparity in the values exchanged and gross inequality of bargaining power when coupled with terms that unreasonably favor the stronger party. *See* Restatement (Second) of Contracts § 208, cmt. a, c, d (1981); *see also In re Poly-Am.*, 262 S.W.3d at 348 (citing § 208).

We begin our analysis by noting that Parvizian cites only a definition of force majeure in the lease agreement and does not cite or discuss any application of that definition in the lease as being unconscionable. Parvizian does not explain how a definition alone can be unconscionable, and we decline to craft an argument for Parvizian. *See, e.g.*, *Brown v. Green*, 302 S.W.3d 1, 14 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (declining to expand on party's conclusory argument).

In regards to the damages section of the lease, Parvizian focuses on the clause allowing Eclectic to recover "the cost of repairing, altering, remodeling, or otherwise putting the Premises into a condition acceptable to [a new] tenant or tenants" after a default by Parvizian. Parvizian complains that this provision "permits the Eclectic [sic] to completely remodel the premises to the subjective liking of new tenants." Parvizian further suggests that the clause would allow Eclectic to "substantially upgrade" the premises and make capital improvements at Parvizian's expense. Parvizian also describes itself as a "small rug shop" and

6

argues that "[t]he bargaining power of the parties is completely lopsided" and the level of peril imposed by the provision "shocks the conscience."

The nature of a landlord-tenant relationship entails inherent risks that may be assigned between the parties. One risk, as actually occurred in this case, is that the tenant will stop paying rent and abandon the premises. In the event of such a default, a new tenant or tenants would need to be found and the premises would likely need to be prepared for such new tenant or tenants. Such occurrences would almost certainly generate costs. The lease in this case assigned those costs to the tenant, who was the defaulting party. There is nothing inherently unconscionable about this scheme.

Although, as mentioned, Parvizian intimates that the relationship here involved "completely lopsided" bargaining power and an unequal exchange of values, Parvizian has provided no evidence or analysis supporting those conclusions. There does not appear to be any evidence in the record, and Parvizian has certainly not cited any, regarding either the relative bargaining power of the parties or the relative value of the exchanged promises. *See generally* Restatement (Second) of Contracts § 208, cmt. a, c, d. Parvizian's chief complaint appears to be that Eclectic could have taken the clause in question to an extreme and charged Parvizian for major upgrades and capital improvements (such as remodeling the premises "in solid gold"), but as discussed below in the section on damages, Parvizian did not offer evidence that such overcharging occurred here.

Perhaps more importantly, whenever a tenant defaults, the landlord has a statutory duty to mitigate its damages. *See* Tex. Prop. Code § 91.006(a); *see also* Black's Law Dictionary 1154 (10th ed. 2014) (defining "mitigate" as "[t]o make less severe or intense; to make less harmful, unpleasant, or seriously bad"); *DDR DB Stone Oak, L.P. v. Rector Party Co.*, No. 04-17-00018-CV, 2017 WL 6032541,

at *3 (Tex. App.—San Antonio Dec. 6, 2017, no pet.) (mem. op.) ("The expenses incurred in an effort to mitigate damages are not to aggravate, but to lessen, the amount for which the wrongdoer might be held liable.") (quoting *Tex. & P. Ry. Co. v. Mercer*, 127 Tex. 220, 225, 90 S.W. 557, 560 (1936)). *See generally Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) (explaining that the universal rule in measuring damages for a breach of contract is to provide *just compensation* for any loss or damage actually sustained as a result of the breach and a party should be awarded neither less nor more than its actual damages). In this context, the duty to mitigate requires a landlord to find a tenant "suitable under the circumstances." *Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.*, 948 S.W.2d 293, 299 (Tex. 1997). Parvizian's stated concern that Eclectic could have used the damages provision to make major upgrades and capital improvements and even remodel in solid gold because a new tenant required such efforts does not take this statutory duty into account. In light of this limitation on the scope of possible damages, Parvizian has not established that the lease was unconscionable as a matter of law; accordingly, we overrule its fifth and sixth issues.

## II. Release and Novation

Under issue two, Parvizian asserts that a genuine issue of material fact exists regarding the affirmative defenses of release and novation. Parvizian generally contends that Eclectic agreed to terminate the lease, release Parvizian from its obligations under the lease, and substitute the lease agreements with the new tenants for the lease agreement with Parvizian. To avoid summary judgment by raising an affirmative defense, a nonmovant must produce sufficient evidence to at least raise a material issue of fact as to each element of the affirmative defense. *E.g.*, *Leonard v. Knight*, 551 S.W.3d 905, 909–10 (Tex. App.—Houston [14th Dist.] 2018, no pet.). The evidence in this case does not raise a genuine issue of

material fact on these affirmative defenses.

**Release.** In general, a release surrenders legal rights or obligations between the parties to an agreement, extinguishes those claims or causes of action as effectively as would a prior judgment between the parties, and is an absolute bar to any right of action on the released matter. *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993); *Ramos v. Hernandez*, No. 02-22-00393-CV, 2023 WL 5115319, at *4 (Tex. App.—Fort Worth Aug. 10, 2023, no pet. h.) (mem. op.). To establish the affirmative defense of release, the movant is required to prove the elements of a valid and binding contract, i.e., an offer, acceptance, a meeting of the minds, each party's consent to the terms, execution and delivery of the contract with the intent that it be mutual and binding, and consideration. *See Ramos*, 2023 WL 5115319, at *4; *Kang v. Derrick*, No. 14-13-00086-CV, 2014 WL 2048424, at *5 (Tex. App.—Houston [14th Dist.] May 15, 2014, pet. denied) (mem. op.).

As stated, Parvizian generally contends that Eclectic agreed to terminate the lease and release Parvizian from its obligations thereunder. In support, Parvizian first cites to a verified pleading, which was not a live pleading at the time summary judgment was granted, and two verifications of that pleading, which were not attached to or referenced in the response to the motion for summary judgment. Pleadings, even when sworn, are generally not competent summary judgment evidence, and a party cannot rely on its own pleaded allegations as evidence of facts to oppose a summary judgment motion. *See, e.g.*, *Regency Field Servs., LLC v. Swift Energy Operating, LLC*, 622 S.W.3d 807, 818–19 (Tex. 2021). Moreover, we will not consider evidence on appeal from a summary judgment that was neither attached to the response nor specifically referenced therein. *See, e.g.*, *White v. Calvache*, No. 05-17-00127-CV, 2018 WL 525684, at *4 (Tex. App.—Dallas

9

Jan. 24, 2018, no pet.) (mem. op.).

Parvizian additionally cites to Mireskandari's affidavit wherein he asserted that Mody believed he could obtain higher rent from new tenants and the plan was for Parvizian to finish its liquidation sale while construction began for the new tenants. Parvizian argues that it can be inferred from this statement that there was an intent to release Parvizian from the existing lease. We disagree. Even assuming that Mody believed he could raise rents on new tenants and construction began during the liquidation, this would not have been inconsistent with Eclectic intending to enforce its rights and remedies under the lease with Parvizian. Parvizian also suggests that if Eclectic began construction for the new tenants while Parvizian still occupied the building, this conduct could have been a breach of the lease, but Parvizian offers no explanation as to why this would be the case and does not cite or discuss sections of the lease that such conduct would have violated. We again decline to make Parvizian's argument for it. *See Brown*, 302 S.W.3d at 14.

Lastly, Parvizian cites to an email Mireskandari sent to Mody indicating that they had discussed terminating the lease. Mody, however, responded to this email shortly after it was sent and expressly stated that he could not agree to the terms in Mireskandari's email. More importantly, even if Mireskandari's email could be seen as some evidence the lease was terminated, it still would be no evidence of a release. The lease contains express provisions governing the relief and remedies available to Eclectic upon the event of a termination after a default by Parvizian. These rights under the contract would entitle Eclectic to much the same damages as was awarded by the trial court in this case. Thus, far from resulting in a release of rights or obligations between the parties, termination under the lease would result in the same or similar relief as that obtained in this case. *See Dresser Indus.*,

10

853 S.W.2d at 508. Parvizian failed to raise a material issue of fact on its release affirmative defense.

**Novation.** Novation is the substitution of a new agreement between the same parties or the substitution of a new party with respect to an existing agreement. *Zaporozhets v. Ct. Appointed Receiver in Cause No. 12-DCV-199496*, No. 14-14-00143-CV, 2014 WL 5148151, at *3 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.). When a novation occurs, only the new agreement can be enforced. *Id*. The party raising a novation defense must establish (1) the existence of a previous, valid obligation; (2) a mutual agreement of the parties to a new contract; (3) the extinguishment of the old contract; and (4) the validity of the new contract. *Id*. A court can infer that a new contract is a novation of a previous contract if the two contracts are so inconsistent with one another that they cannot subsist together. *Farkooshi v. Afisco Interest, LLC*, No. 14-13-00201-CV, 2014 WL 4161708, at *4 (Tex. App.—Houston [14th Dist.] Aug. 21, 2014, no pet.) (mem. op.). Absent such an inconsistency, "a second contract will operate as a novation of a first contract only when the parties to both contracts intend and agree that the obligations of the second shall be substituted for and operate as a discharge of the obligations of the first." *Chastain v. Cooper & Reed*, 152 Tex. 322, 325, 257 S.W.2d 422, 424 (1953); *see also Farkooshi*, 2014 WL 4161708, at *4. Ultimately, whether a new contract operates as a novation is a question of intent. *Zaporozhets*, 2014 WL 5148151, at *3. Novation is never presumed; intent must be clear from the evidence. *Id*.

Parvizian cites the same evidence in support of its novation defense that it did in support of its release defense. This evidence again fails to raise a genuine issue of material fact. There is no evidence in the record indicating that the parties to both the original lease agreement between Eclectic and Parvizian and the new

lease agreements between Eclectic and Abraham Rugs and Bath Floor Décor intended that the obligations of the new leases should be substituted for and operate as a discharge of the obligations in the original lease. *See Chastain*, 257 S.W.2d at 424; *Farkooshi*, 2014 WL 4161708, at *4. To the contrary, the evidence is clear that Parvizian breached the original lease agreement by abandoning the premises and failing to pay rent, and as part of the relief and remedies provided in the lease for such breach, Eclectic was entitled to relet the premises to one or more new tenants. Indeed, a failure to relet the premises during the remaining term on the original lease could have been seen as a failure to mitigate damages. Thus, the old lease and the new leases were not inherently inconsistent, and there is no evidence of novation under the facts of this case. *See Zaporozhets*, 2014 WL 5148151, at *3; *Farkooshi*, 2014 WL 4161708, at *4; *see also Garcia v. First Colony Mall, LLC*, No. 01-17-00336-CV, 2018 WL 2638684, at *7 (Tex. App.—Houston [1st Dist.] June 5, 2018, no pet.) (mem. op.) (holding tenant failed to raise issue of fact on novation defense where lease expressly allowed landlord to relet the premises upon a default). Accordingly, we overrule Parvizian's second issue.

### III.   Mitigation Efforts

In its third issue, Parvizian insists that a genuine issue of material fact exists regarding the sufficiency of Eclectic's mitigation efforts. As mentioned above, a landlord has a duty to make reasonable efforts to mitigate damages when a tenant breaches a lease and abandons the property. *See* Tex. Prop. Code § 91.006(a); *Austin Hill Country*, 948 S.W.2d at 299. A tenant's assertion that a landlord failed to mitigate damages is an affirmative defense. *See Austin Hill Country*, 948 S.W.2d at 299; *Park Ten Invs., LLC v. First Serv. Credit Union*, No. 14-21-00562-CV, 2022 WL 17038106, at *7 (Tex. App.—Houston [14th Dist.] Nov. 17, 2022, no pet.) (mem. op.). Consequently, to avoid summary judgment by raising

12

mitigation, Parvizian was required to present evidence raising a material issue of fact on the defense. *See Leonard,* 551 S.W.3d at 909–10; *H & H Steel Fabricators, Inc. v. Wells Fargo Equip. Fin., Inc.*, No. 02-15-00391-CV, 2016 WL 6277371, at *4 (Tex. App.—Fort Worth Oct. 27, 2016, no pet.) (mem. op.). A landlord's duty to mitigate in a case such as this requires the landlord use reasonable efforts to relet the premises to a tenant "suitable under the circumstances." *Austin Hill Country*, 948 S.W.2d at 299; *Park Ten Invs.*, 2022 WL 17038106, at *7. Reasonable efforts are those that a party can avoid at a trifling expense or with reasonable exertions. *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995). A tenant bears the burden to prove that its landlord failed to mitigate damages and the amount by which the landlord could have reduced its damages. *See Austin Hill Country*, 948 S.W.2d at 299; *Park Ten Invs.*, 2022 WL 17038106, at *7.

Under this issue, Parvizian offers a profusion of short arguments. We do not find any of them persuasive. Parvizian suggests that a jewelry store showed interest in the premises and raises the question of what the jewelry store would have been willing to pay in rent, but just raising this question is not evidence of a failure to mitigate, and the only citation Parvizian offers in support is to the Eclectic/Parvizian lease itself. Parvizian asserts that Mireskandari stated in his affidavit that new tenants were moving into the building as early as August 2018, but what Mireskandari actually said is that remodeling for the new tenants was occurring at that time, not that new tenants had taken possession that early.

Parvizian additionally suggests that Mireskandari's statement that Mody thought he could get double the rent from new tenants indicates Eclectic did not obtain what Mody thought it could obtain for rent. However, even assuming Mody thought he could get more rent at some point, this does not create a material issue

of fact on a failure to mitigate damages. The question is whether with reasonable efforts, could Eclectic have further reduced its damages? *Austin Hill Country*, 948 S.W.2d at 299; *Park Ten Invs.*, 2022 WL 17038106, at \*7. A second-hand report of what Mody at one point thought is not by itself more than a scintilla of evidence that Eclectic could have obtained higher rents through reasonable efforts.

Parvizian also asserts that Eclectic gave the new tenants better deals than it had given Parvizian despite the upgrades, failed to collect rent until March 2019 for one new tenant and July 2019 for the other new tenant, and took too long to remodel the premises for the new tenants. None of these assertions, however, constitutes evidence that Eclectic failed to use reasonable efforts to relet the premises and mitigate its damages. The arguments are built upon speculation and conjecture and do not raise a material issue of fact. *See Husaini v. Pawnee Leasing Corp.*, No. 14-20-00415-CV, 2022 WL 1463715, at \*4 (Tex. App.—Houston [14th Dist.] May 10, 2022, no pet.) (mem. op.) (rejecting failure to mitigate arguments in summary judgment context as "vague and speculative"); *Kartsotis v. Bloch*, 503 S.W.3d 506, 522 (Tex. App.—Dallas 2016, pet denied) (rejecting failure to mitigate arguments as conclusory and speculative). Accordingly, we overrule Parvizian's third issue.

## IV.  Impossibility and Force Majeure

Under issue four, Parvizian asserts that there is a genuine issue of material fact regarding the affirmative defenses of impossibility and force majeure. *See, e.g.*, *Husaini*, 2022 WL 1463715, at \*3 ("The party seeking to excuse its performance under a contractual force majeure clause . . . bears the burden of proof to establish that defense."); *Grayson v. Grayson Armature Large Motor Div., Inc.*, No. 14-09-00748-CV, 2010 WL 2361432, at \*4 (Tex. App.—Houston [14th Dist.] June 15, 2010, pet. denied) (mem. op.) (identifying impossibility as an affirmative

defense). Parvizian bases both defenses solely on the fact that its president, Gus Parvizian, died during the lease period. Parvizian describes this occurrence as an "act of God" that prevented its performance under the lease due to the importance of Gus to the company that bears his name.

The defense of impossibility may be applicable due to: (1) the death or incapacity of a person necessary for performance, (2) the destruction or deterioration of an item necessary for performance, or (3) government regulation that prevents performance. *Husaini*, 2022 WL 1463715, at *3 (citing *Tractebel Energy Mktg., Inc. v. E.I. Du Pont De Nemours & Co.*, 118 S.W.3d 60, 66 (Tex. App.—Houston [14th Dist.] 2003, pet. denied), and Restatement (Second) of Contracts § 261 (1981)). When a party's performance is made impracticable by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made, its duty to render that performance is discharged. *Id*. A party relying on the defense of impossibility must also demonstrate that it made reasonable efforts to overcome the obstacle to performance. *Id*.

Regardless of its historical underpinnings, the existence, scope, and application of a force majeure defense depend on the terms stated in the contract. *See Zurich Am. Ins. Co. v. Hunt Petrol. (AEC), Inc.*, 157 S.W.3d 462, 466 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *see also Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 806–07 & n.32 (Tex. 2023) (collecting cases). Although Parvizian once again cites a definition of force majeure in the lease agreement, Parvizian does not cite a force majeure clause in the lease that it believes applies under the circumstances presented in this case.

The lease in this case was, of course, between Eclectic as landlord and Parvizian the corporation, not Gus Parvizian the individual, as tenant. In its briefing, Parvizian refers to Gus as its only key shareholder and only key employee

15

and argues that he was so essential to its operations that "[t]he cost of performing on the lease without Mr. Parvizian['s] personal knowledge, skill, relationships, experience, etc. could be shown to be excessive and unreasonable for the corporation." However, the only evidence Parvizian cites under this issue is its own third amended petition. As stated above, pleadings are generally not competent summary judgment evidence and cannot be used as evidence of facts to oppose a summary judgment motion. *See Regency Field Servs.*, 622 S.W.3d at 818–19.

Elsewhere in its brief, Parvizian notes that Mireskandari indicated in his affidavit that Gus was the corporation's only shareholder. Mireskandari, who states that he was hired by Parvizian to conduct a liquidation sale, does not state how he knows Gus was the sole shareholder, and Parvizian does not cite any other evidence to support the assertion. But even assuming Gus was the only shareholder of Parvizian, this does not explain how his death prevented Parvizian's performance under the lease, why his survival was necessary for performance, whether his death was an event the non-occurrence of which was a basic assumption on which the contract was made, what reasonable efforts Parvizian took to overcome the obstacle to performance, or how Gus's death invoked any force majeure clause in the lease. *See Husaini*, 2022 WL 1463715, at *3; *Zurich Am.*, 157 S.W.3d at 466. In short, the cited evidence does not raise a material issue of fact on either defense—impossibility or force majeure. Accordingly, we overrule the fourth issue.

## V. Calculation of Damages

In its first issue, Parvizian contends that a genuine issue of material fact exists regarding the calculation of Eclectic's damages. As explained above, in the event of a default, the lease made Parvizian liable for brokers' fees, "the cost of

repairing, altering, remodeling, or otherwise putting the Premises into a condition acceptable to such [new] tenant or tenants," and attorney's fees, in addition to any remaining rent for the lease term.

Eclectic's evidence on damages included Mody's affidavit in which he calculated the amount of unpaid rent that had not been offset by rent paid by the new tenants as well as the deferred rent that was still owed. He also explained that Eclectic was able to rent the premises to two businesses and "had to remodel and alter the Premises to fit the needs of both new Tenants." He further stated that Eclectic "expended $125,563.55 in remodeling expenses" and "had to pay Real Estate Brokers fees totaling $60,210 in order to obtain new tenants." Another document in the record that also appears to be a listing of damages by Mody includes the notation that "[w]e tried to Lease the entire space to a single user. Unfortunately, we couldn't find a tenant for such a large space. Therefore, we ended up demising the space into two. The total Demo/Buildout expenditure comes to $125,563.55. We have attached invoices for all expenses." The record also includes a list of rents paid by the new tenants and a list of service and material providers on the remodel project and the amounts they billed for different aspects of the project that, when added together, totals the amount the court awarded. Additionally, there is an architect's design for dividing the space into two separate retail spaces and many pages of receipts and invoices for expenses. Moreover, in Mireskandari's affidavit, he acknowledges that the premises were divided into two retail spaces for the new tenants that likely included tenant-specific features and that "[p]resumably there would be additional ADA compliant bathrooms, updated electrical requirements, reconfiguration of plumbing, lighting, emergency exits, ingress egress doors, etc." The summary judgment record also contains the lease itself and the rent deferral agreement. We further note that it does not appear that

17

Parvizian deposed anyone or obtained any discovery or other evidence that would cast doubt on the validity of the expenses that Eclectic claims were required for the division of the space into two units. *Cf. Jallan v. PNA Invs., LLC*, No. 14-21-00460-CV, 2023 WL 5316877, at *6 (Tex. App.—Houston [14th Dist.] Aug. 18, 2023, no pet. h.) (mem. op.) (affirming judgment for damages based on similar lease language); *A-S 103 Sam Houston Town Ctr., L.P. v. SOS Furniture Co., Inc.*, No. CV H-19-2664, 2020 WL 7249829, at *2–4 (S.D. Tex. Nov. 2, 2020) (recommending summary judgment in case with substantially similar elements of damages), report and recommendation adopted, 2020 WL 7247783 (S.D. Tex. Dec. 9, 2020).

Parvizian raises a plethora of scattershot arguments regarding damages, some of which appear to raise mitigation concerns. We will address each argument in turn, applying the mitigation rules discussed above where necessary.

Parvizian complains that Eclectic apparently hired a succession of electricians and plumbers, arguing that this ran up costs. However, beyond pure speculation, Parvizian cites no evidence supporting the conclusion that the use of multiple contractors was unnecessary, Eclectic's fault, or drove up costs. *See Husaini*, 2022 WL 1463715, at *4 (rejecting arguments as "vague and speculative"); *Kartsotis*, 503 S.W.3d at 522 (rejecting arguments as conclusory and speculative).

Parvizian complains that the premises were divided into two units, argues "[a]rchitectural improvements are not standard buildouts," and suggests that Eclectic is trying to make Parvizian pay for electrical, plate glass, and other upgrades as well as "capital investments" in lighting and exhaust fans. As discussed, however, the lease clearly authorized Eclectic to repair, alter, remodel, or otherwise put the Premises into a condition acceptable to new tenants and

charge those expenses to Parvizian. Mody explained in his affidavit and the other document discussing the remodeling charges that all of the work was necessary to accommodate the new tenants. Parvizian offered no evidence controverting Mody's assertions, only bare allegations and speculation.

Parvizian points out that the new leases extended beyond the term of Parvizian's lease and thus will ultimately be more valuable than the prior lease. While this is undoubtedly true, Parvizian offers no analysis or authority suggesting that this means Eclectic was entitled to less rent for the period it received no rent from any source. A reading of the lease reveals no such intention by the parties.

Parvizian further points out that the documentation presented by Eclectic includes some receipts and invoices made out to entities and individuals other than Eclectic itself. In its briefing, Eclectic shows—by reference to other evidence in the record—how each of these entities and individuals was connected to Eclectic.[2] Moreover, Mody represented in his affidavit that Eclectic incurred all of the charges that it was requesting as damages. Parvizian offered no evidence of its own that rebuts Eclectic's damages evidence.

Regarding attorney's fees, Parvizian asserts that "[a] mathematical analysis of the claim for attorney's fees suggest[s] 396 hours of work at $375 per hour with no tasks assigned to associates or paralegals for a breach of contract case." It then insists that Eclectic's attorney should have to prove at trial that he spent that much time on the case. In his attorney's fees affidavit, however, Eclectic's attorney explained that the requested fees were based on a contingency agreement and thus were not calculated on a per hour basis. Parvizian makes no specific complaint regarding the manner in which the contingency fee was calculated.

---

[2] As Eclectic also notes, some of the bills referenced by Parvizian were for charges that Eclectic is not seeking to recover in this case.

19

Lastly, Parvizian asserts that evidence indicates it was being overcharged for rent because although the lease described the leased space as "[a]n area of approximately 9,010 square feet more or less of leasable Floor Area," an architect's drawing for the remodel shows the actual leased space was only 8,152 square feet.[3] This is important, as it relates to damages, because the lease calculated minimum rent (before the addition of maintenance-related charges) based on a set price per square foot of leased space. Moreover, paragraph 3.4 of the lease provides that:

> The location of the Premises . . . and the Floor Area stated herein are approximate. If at anytime [sic], there is a dispute as to the location . . . or the Floor Area of the Premises, the written determination of Landlord's architect or construction manager as to such location . . . or Floor Area shall be binding upon both parties hereto. In the event the Floor Area as determined by Landlord's architect or construction manager differs from the Floor Area set forth in Section 1.1(g), the Minimum rent to be paid by the Tenant shall be adjusted to the figure obtained by multiplying the exact square footage of Floor Area in the Premises by the rental per square foot of Floor Area in the Premises. If this calculation produces a monthly Minimum Rent that is different than that set forth in Section 1.1(j), the monthly Minimum Rent as determined by this Section shall control.

Based on Eclectic's architect's drawing and the application of lease paragraph 3.4, the trial court erred in its calculation and award of damages for unpaid "minimum rent." Under Texas Rule of Appellate Procedure 44.1, we may not remand a case solely on unliquidated damages if liability is also contested. Tex. R. App. P. 44.1(b); *Rancho La Valencia, Inc. v. Aquaplex, Inc.*, 383 S.W.3d 150, 152 (Tex. 2012). "By their very nature, unliquidated damages are not susceptible to

---

[3] Eclectic asserts that the 8,152 number comes from a diagram showing what the premises would look like after the division into two spaces and suggests that the diagram leaves some of the actual floor space out of the total calculation. But the very next page of the architect's project design shows the "existing retail space" before division as 8,152. Indeed, both the before and after diagrams show the same square footage: 8,152.

exact calculation and involve a range of possible answers." *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 186 (Tex. 2012). The "minimum rent" damages at issue here, however, appear to be in the nature of liquidated damages as they are susceptible to exact calculation by simple arithmetical process. *See, e.g.*, *DeNucci v. Matthews*, 463 S.W.3d 200, 216 & n.6 (Tex. App.—Austin 2015, no pet.). Accordingly, we sustain Parvizian's first issue in part and remand for a new calculation of the damages for unpaid "minimum rent." Because, as discussed above, the award of attorney's fees was based on a percentage of the overall damages awarded, we also reverse the award of attorney's fees and remand for a new calculation of the fees to be awarded.[4]

## *Conclusion*

We reverse and remand the portion of the judgment awarding Eclectic damages based on a calculation of unpaid "minimum rent" as well as the portion of the judgment awarding attorney's fees. We remand solely for a recalculation of those damages and the attorney's fees. We affirm the remainder of the judgment.

/s/ Frances Bourliot
Justice

Panel consists of Justices Bourliot, Hassan, and Wilson.

---

[4] Although, as discussed above, in the original proceedings below, the trial court appeared to award fees in this case strictly on a contingency basis, we note that the Texas Supreme Court has proclaimed that the base lodestar method of calculating fees is presumed to reflect the reasonable and necessary attorney's fees that can be shifted to the non-prevailing party when supported by sufficient evidence. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 499 (Tex. 2019). Although a contingency fee arrangement may be a factor in calculating the base lodestar amount, only fees reasonable and necessary for the legal representation will be shifted to the non-prevailing party, and not necessarily the amount contracted for between the prevailing party and its attorney. *Id*. at 487–88, 499–500.

21