**Affirmed and Opinion Filed November 13, 2024**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-24-00009-CV

## AMBIT MARKETING, LLC, Appellant
## V.
## TLC ENERGY GROUP, LLC AND TERRY LACORE, Appellees

### On Appeal from the 471st Judicial District Court
### Collin County, Texas
### Trial Court Cause No. 471-02108-2023

## MEMORANDUM OPINION

Before Justices Molberg, Breedlove, and Kennedy
Opinion by Justice Breedlove

The trial court denied Ambit Marketing, LLC's motion to compel arbitration. In three issues, Ambit contends the trial court erred by (1) ordering an evidentiary hearing on the motion, (2) denying the motion as to appellee TLC Energy Group, LLC, and (3) denying the motion as to appellee Terry LaCore. Concluding that (1) Ambit failed to establish that the parties agreed to amend the terms of their long-term oral agreement through the electronic execution of an amendment containing an arbitration provision, and (2) the trial court did not err by ordering an evidentiary hearing, we affirm the trial court's order.

## BACKGROUND[1]

Plaintiff/appellee Terry LaCore is "an entrepreneur in the network marketing industry," according to his declaration filed in the trial court. He is the manager of plaintiff/appellee TLC Energy Group, LLC.

Defendant/appellant Ambit Marketing, LLC markets and sells electric and natural gas services in deregulated markets across the United States. Ambit hires independent consultants to sell its services.

In April 2023, LaCore and TLC filed suit against Ambit alleging breach of an oral agreement made between the parties in 2006. LaCore and TLC alleged that, in or around November 2006, LaCore agreed to invest in Ambit's startup efforts by providing hundreds of thousands of dollars of funding for marketing initiatives and training programs for Ambit's consultants, and recruiting and developing a team of Ambit consultants. In exchange, Ambit agreed to give TLC (LaCore's company) a place at the top of Ambit's downline and the right to receive monthly payments based on downline sales. TLC pleaded that it "built a profitable sales organization within Ambit's business," and Ambit paid commissions "as agreed from 2006 through March 2023."

---

[1] Portions of the record are sealed. We make "every effort to preserve the confidentiality of the information the parties have designated as confidential," *see MasterGuard L.P. v. Eco Technologies Int'l, LLC*, 441 S.W.3d 367, 371 (Tex. App.—Dallas 2013, no pet.), consistent with our obligation to hand down a public opinion explaining our decisions based on the record. *See Kartsotis v. Bloch*, 503 S.W.3d 506, 510 (Tex. App.—Dallas 2016, pet. denied) (citing TEX. R. APP. P. 47.1, 47.3 and TEX. GOV'T CODE ANN. § 552.022(a)(12) for proposition that opinions are public information).

In March 2023, however, Ambit notified TLC and LaCore that it was terminating the agreement because LaCore had breached the noncompetition provisions in Ambit's "Consultant Policies and Procedures." Under the Policies and Procedures, Ambit's "consultants" were prohibited from participating or recruiting for "any other multilevel, network marketing, or direct sales business or venture."

In their original petition, TLC and LaCore denied that they were bound by Ambit's Policies and Procedures, and in any event had not violated them. TLC alleged claims for breach of contract and violations of Chapter 54 of the Texas Business and Commerce Code,[2] and also sought equitable relief. LaCore and TLC together pleaded for a judgment declaring that Ambit's Policies and Procedures were not enforceable as to them and were unenforceable covenants not to compete. They also sought a declaratory judgment that they had not "violated the provisions as alleged by Ambit."

Ambit answered and filed a motion to compel arbitration. Ambit contended that TLC and LaCore were parties to a "Consultant Agreement" that contained an arbitration agreement. The "Consultant Agreement" was not a single document, but rather, was comprised of three separate documents: (1) Independent Consultant Application, (2) Consultant Policies and Procedures, and (3) a compensation plan.

---

[2] *See* TEX. BUS. & COM. CODE ANN. §§ 54.001–.006 (Compensation Agreements for Sales Representatives).

–3–

The Consultant Policies and Procedures contained the following arbitration agreement:

> 12.2: DISPUTE RESOLUTION.
>
> 12.2.1: MEDIATION. Prior to entering into arbitration, Ambit (on behalf of the Ambit Companies) and the consultant shall meet in good faith and attempt to resolve any dispute arising from, or relating to, the Agreement through non-binding mediation. . . .
>
> 12.2.2: ARBITRATION. If mediation is unsuccessful, Ambit (on behalf of the Ambit Companies) and the consultant shall resolve any controversy, claim, or dispute between or amongst them, including, but not limited to, any controversy, claim, or dispute arising out of, or relating in any way to, the Agreement, or the breach thereof by binding arbitration. THE AMBIT COMPANIES AND CONSULTANTS AGREE THAT IN ORDER TO PROMOTE THE FULLEST EXTENT REASONABLY POSSIBLE A MUTUALLY AMICABLE RESOLUTION OF THE DISPUTE IN A TIMELY, EFFICIENT, AND COST-EFFECTIVE MANNER, THEY WILL WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY AND SETTLE THEIR DISPUTE BY SUBMITTING THE CONTROVERSY TO BINDING ARBITRATION. THE AMBIT COMPANIES AND CONSULTANTS WAIVE ALL RIGHTS TO TRIAL BY JURY.
>
> The Parties understand and agree that this Section 12.2.2 operates as a separate and distinct agreement that is severable from the remainder of the Agreement and is enforceable regardless of the enforceability of any other provision of the Policies or the Agreement as a whole. Consideration for this provision includes, without limitation, the Parties' mutual agreement to arbitrate claims. As noted above, this agreement to arbitrate shall survive any terminations, cancellation, or expiration of the Agreement.

Ambit contended that TLC agreed to be bound by these documents when, on March 14, 2022, someone used LaCore's login credentials to enter "Ambit's online

application, called PowerZone" and through a click wrap[3] acceptance, electronically clicked through an acknowledgment, agreement, and acceptance of these documents.

Ambit proffered the declarations of Vani Chandupatla and Darrell Starkweather. Chandupatla testified about the login procedures on Ambit's PowerZone portal and explained that on March 14, 2022, LaCore's credentials were used to log in to PowerZone on behalf of TLC "by entering its unique 'Consultant ID Number' and 'Password.'" She testified that the user who logged in was then required to agree to the "Consultant Policies and Procedures" and to the "Independent Consultant Application" by clicking on check boxes and an "Accept" button before proceeding into PowerZone. Starkweather, the "Senior Director, Field Development and Support for Ambit Marketing," testified that the "Compensation Plan" referred to a document entitled "Three Ways to Earn."

LaCore testified by declaration that neither he nor TLC had ever been independent consultants for Ambit and had never filled out or executed an Independent Consultant Application or agreed to the Consultant Policies and Procedures. In response to Ambit's motion, TLC and LaCore argued that Ambit's summary proof was insufficient to establish the existence of a valid agreement to arbitrate with either TLC or LaCore. In his supporting declaration, LaCore further testified:

---

[3] "'Click-wrap' agreements require the user to review or scroll through terms and assent to the contractual terms by clicking a button that reads "I Agree" or manifesting some other means of express assent." *Hotels.com, L.P. v. Canales*, 195 S.W.3d 147, 154–55 (Tex. App.—San Antonio 2006, no pet.).

4. In or around November 2006, I was approached by Ambit's co-founders, Jere W. Thompson, Jr. and Chris Chambless, to participate in Ambit's startup efforts. I agreed to participate in those efforts for approximately 6-8 months. Those efforts included personally providing funding for marketing initiatives, including the costs associated with a magazine publication promoting Ambit. Additionally, I personally paid for the costs associated with developing the initial training program for Ambit's independent consultants. In addition to the startup funding described herein, I devoted 6-8 months to recruiting and developing Ambit's team of independent consultants.

5. In exchange for my efforts and funding, my company, TLC Energy Group, LLC, was given a place at the top of Ambit's downline and given the sales designation of "National Consultant." TLC Energy was to receive monthly payments based on downline sales. All payments to TLC Energy were to be calculated at the National Consultant level; however, the position in Ambit's downline and agreed payments were never dependent on the customer enrollment or consultant development benchmarks described in the Compensation Plan attached as Exhibit E to Ambit's Motion. TLC Energy was to receive the monthly payments described herein for the life of Ambit's business based on my personal efforts and investments in Ambit at its inception and promoting its growth.

6. Because of the agreement described above, neither TLC Energy nor I have ever been an independent consultant for Ambit. Neither TLC Energy nor I ever applied for or agreed to the Independent Consultant Application or the Consultant Policies and Procedures attached to Ambit's Motion as Exhibit B and Exhibit C, respectively, or any prior version of either document.

. . . .

8. I discontinued my personal efforts on behalf of Ambit in 2007 to pursue different network marketing business opportunities as agreed with Ambit's leadership. Despite the discontinuation of my efforts, TLC Energy continued to receive monthly payments from Ambit until March 2023 when Ambit purported to terminate TLC Energy's independent consultant status, a status that TLC Energy never sought or held.

–6–

The trial court heard Ambit's motion to compel arbitration in a non-evidentiary hearing on August 1, 2023. The parties then presented evidence at a hearing on October 11, 2023, at which Chandupatla, Starkweather, and LaCore testified. The trial court admitted documents into evidence, including Exhibit 3, a form of the Ambit Independent Consultant Application; Exhibit 4, a form of Ambit's Policies and Procedures; and Exhibit 5, a form document entitled "Three Ways to Earn." Exhibit 6, offered through the testimony of Chandupatla, was an excerpt from a spreadsheet that recorded each occasion when modified Policies and Procedures and Independent Consultant Applications were accepted on TLC's PowerZone account. She stated that Ambit began "keeping records like this" "from 2014."

A March 14, 2022, entry on Exhibit 6 shows TLC's consultant number and the following text under "Verbiage":

> Power Zone Login Prerequisites
>
> You must agree to the following before you can continue using PowerZone
>
> Policies and Procedures
>
> Independent Consultant Application
>
> Please review the most current Policies and Procedures. After reviewing the document, we encourage you to print a copy if you do not already have a hard copy. You will need to agree that you have read and understand this document to continue using PowerZone.

On cross-examination, however, Chandupatla could not confirm whether TLC ever actually executed an original independent consultant application or when, if ever, TLC became a consultant for Ambit. She could only testify that there was a

recorded date when TLC accepted amended and modified versions of these documents. Chandupalta testified:

> Q Where else would I look, at least in Exhibit 6 or one of the exhibits that's been introduced, to determine when TLC completed an independent contractor application in order to become a consultant for Ambit?
>
> A I don't understand your question. Repeat it, please.
>
> Q You said according—I asked if Exhibit 6 demonstrates that—that TLC became a consultant for Ambit in 2014 or '13, whatever date it was you gave me. You said no.
>
> A No. It depicts TLC agreeing to the amended agreement. It doesn't depict them becoming a consultant on that date.
>
> Q So when did TLC agree or complete or execute or sign an independent consultant agreement to become a consultant with Ambit?
>
> A You just told me that. 2006.
>
> Q I did not. I told you that they started getting paid in 2006. I'm asking: When did TLC complete an application, an executed application, to become a consultant for Ambit?
>
> A I'm not aware because we—well, Ambit has been tracking the information in 2014, and that's the date that we have here for consultant agreement.
>
> Q So you don't know when Ambit became a consultant—excuse me, when TLC became a consultant for Ambit.
>
> A I don't.

Similarly, Starkweather did not "have any information about how the account for TLC was created," or "what information Ambit was required to provide to [TLC] to create the initial account" in 2006. He could not testify to PowerZone's use in 2006, although he stated that it was in use when he joined Ambit in 2008. He testified

that TLC was a "vested consultant," but he did not know "what qualified [TLC] for vesting."

After the hearing, the parties presented their closing arguments in written briefs. The trial court denied Ambit's motion to compel arbitration by written order dated December 5, 2023. This appeal followed.

## ISSUES AND STANDARDS OF REVIEW

In its first issue, Ambit contends the trial court erred by ordering an evidentiary hearing on Ambit's motion to compel arbitration. In its second issue, Ambit argues the trial court erred by denying its motion to compel TLC's claims to arbitration where:

> (1) the uncontroverted evidence demonstrated multiple secure processes Ambit utilizes to attribute TLC's use of its unique and secret credentials to TLC; (2) Appellees did not provide evidence that TLC's electronic signature was a product of fraud or a flaw in Ambit's security measures; and (3) Appellees merely denied signing the agreement.

Ambit's third issue is directed to LaCore's requests for declaratory relief. Ambit contends the trial court erred by denying its motion to compel LaCore's claims to arbitration where:

> (1) LaCore seeks the exact same declaratory relief as TLC based on the exact same facts; (2) LaCore has already benefited . . . from the agreement containing the arbitration provision; (3) LaCore seeks a declaration that requires the trial court to interpret a restrictive covenant in the agreement containing the arbitration provision; and (4) practically speaking, if LaCore's arguments were accepted, a trial court would be deciding LaCore's declaratory judgment claim, while an arbitrator decides the identical claim made by TLC.

"A party attempting to compel arbitration must first establish that the dispute in question falls within the scope of a valid arbitration agreement." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). "If the other party resists arbitration, the trial court must determine whether a valid agreement to arbitrate exists. *Id.* "The trial court's determination of the arbitration agreement's validity is a legal question subject to de novo review." *Id.* Accordingly, we review de novo whether an enforceable agreement to arbitrate exists. *Id.*; *Emery v. Hilltop Secs., Inc.*, No. 05-18-00697-CV, 2019 WL 4010775, at *3 (Tex. App.—Dallas Aug. 26, 2019, no pet.) (mem. op.).

"We review a trial court's order denying a motion to compel arbitration for abuse of discretion." *Aerotek, Inc. v. Boyd*, 624 S.W.3d 199, 204 n.19 (Tex. 2021) (internal quotation omitted). "We defer to the trial court's factual determinations if they are supported by evidence but review its legal determinations de novo." *Id.* (internal quotation omitted).

## DISCUSSION

The "strong presumption" favoring arbitration "arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists." *J.M. Davidson, Inc.*, 128 S.W.3d at 227. "Arbitration agreements are interpreted under traditional contract principles." *Id.* The party seeking to enforce an arbitration agreement "must show the agreement meets all requisite contract elements." *Id.* at 228. "The elements required for the formation of a valid contract are: (1) an offer,

(2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Levetz v. Sutton*, 404 S.W.3d 798, 803 (Tex. App.—Dallas 2013, pet. denied).

Ambit proffered no evidence that the parties' 2006 oral agreement included an agreement to arbitrate disputes arising from it. Instead, Ambit asserted that on March 14, 2022, LaCore's login credentials were used to access PowerZone, and in so doing, under the Uniform Electronic Transactions Act, the parties executed the Policies and Procedures and Independent Contractor Agreement, which amended the terms of their sixteen-year relationship and added an agreement to arbitrate their disputes.

Under the Uniform Electronic Transactions Act, an electronic record or signature "is attributable to a person if it was the act of the person." TEX. BUS. & COM. CODE ANN. § 322.009(a); *see also* TEX. BUS. & COM. CODE ANN. §§ 322.001–.021 (Uniform Electronic Transactions Act [UETA]). "The act of the person may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable." *Id.* § 322.009(a). In *Aerotek,* 624 S.W.3d at 209, the supreme court held that once a party has made the required showing, the counterparty's "simple denials" of an electronic signature "are no evidence otherwise."

The UETA "applies only to transactions between parties each of which has agreed to conduct transactions by electronic means." *Parks v. Seybold*, No. 05-13-00694-CV, 2015 WL 4481768, at \*5 (Tex. App.—Dallas July 23, 2015, no pet.) (mem. op.). Therefore, we first consider whether Ambit met its burden to establish that TLC and Ambit agreed to utilize PowerZone to change the terms of their long-standing business arrangement through the electronic execution of an agreement.

## 1. TLC's agreement to arbitrate (Issue 2)

Ambit argues that because it met its burden to establish that TLC could not have logged in to PowerZone on March 14, 2022 without electronically accepting the modified versions of the Policies and Procedures and Independent Consultant Application, Ambit established an agreement to conduct business electronically and TLC's mere denial was no evidence otherwise. Ambit presumes an agreement to conduct business electronically was established by showing occasions on which LaCore's login credentials were used to access TLC's profile and payment information. Ambit then asserts that evidence of its "multiple secure processes" for login were established and argues that TLC did not provide any evidence of fraud or flaw in the login process.

Ambit correctly argues that once there is an agreement to transact business electronically, where evidence is offered to show the efficacy of a security procedure, "simple denials" of execution are no evidence. *See Aerotek*, 624 S.W.3d

–12–

at 209. TLC asserts that it was Ambit's burden to show someone with authority to act on behalf of TLC agreed that PowerZone was the parties' agreed mechanism to exchange contractual documents that governed the terms of their relationship. While there was a record of login occasions when TLC provided profile and banking information through PowerZone, TLC argues it never executed agreements through PowerZone and no one with authority to act on behalf of TLC ever agreed this was a known mechanism for executing agreements.

In contrast to the individual plaintiffs in *Aerotek*, TLC does not deny that someone using LaCore's identification number logged in to PowerZone on March 14, 2022. *Cf. id.* at 202 (each individual plaintiff submitted a sworn declaration acknowledging that he completed an online hiring application but denied "that he had ever seen, signed, or been presented with" the agreement to arbitrate).

What TLC does deny, however, is that its sixteen-year business relationship with Ambit—the basis for its claims in this lawsuit—was governed by an "Independent Consultant Agreement," which Ambit claims was "amended" when LaCore's credentials were used to log in to PowerZone on March 14, 2022.

Ambit relied on Chandupatla and Starkweather to prove the existence of the Independent Consultant Agreement, which Ambit asserts was amended on March 14, 2022. But neither Chandupalta nor Starkweather could identify a document called the "Independent Consultant Agreement" and there is no such document in the record.

The first page of the Consultant Policies and Procedures defines the "Agreement" as "a fully integrated agreement composed of this Policies and Procedures ("Policies"), the Ambit Application, the Ambit Compensation Plan, and the Business Entity Application (if applicable), as they may be amended from time to time pursuant to the procedures set forth herein." But the Ambit Application (also referred to as the Independent Consultant Application), Consultant Policies and Procedures, and the Ambit Compensation Plan do not contain any material terms of an agreement specific to either TLC or LaCore. And, the record does not contain a document that is called the "Business Entity Application." The Ambit Application is a 16-item list of conditions and terms that the "applicant" must "acknowledge," "understand," or "represent," but there are no reciprocal promises describing any consideration that the "applicant" in general—or TLC in particular—will receive in exchange for compliance with the conditions. The Ambit Compensation Plan is a form entitled "Three Ways to Earn," which does not contain any contractual agreement; to the contrary, its first sentence is "Ambit Energy makes no guarantee or promise of income or business."

Ambit's reliance on these documents falls short of establishing that the parties intended to be bound by an "Independent Consultant Agreement" that amended their well-established relationship. Therefore, there is no evidence in the record to challenge LaCore's testimony that the parties' business arrangement was an oral

–14–

agreement that had never been memorialized by execution of agreements through PowerZone.

Ambit contends that by clicking through PowerZone to obtain payment, TLC agreed to transact business electronically, effectively executed an amended "Independent Consultant Agreement," and agreed to be bound by the terms of the modified Policies and Procedures. However, this argument is circular. Without evidence of an original agreement, there is no evidence in the record that anyone with authority to act on behalf of TLC intended to use PowerZone to execute an agreement that would materially change the terms of their sixteen-year oral agreement.

Citing this Court's opinion in *Momentis U.S. Corp. v. Weisfeld*, No. 05-13-01250-CV, 2014 WL 3700697, at *5 (Tex. App.—Dallas July 22, 2014, no pet.) (mem. op.), Ambit argues that UETA does not require proof of an independent agreement to conduct business electronically. *See* UETA § 322.005(b) (parties' intent "is determined from the context and surrounding circumstances"). In *Momentis*, we considered whether the plaintiffs, applicants for "independent representative" positions with Momentis, had agreed to arbitrate disputes. 2014 WL 3700697, at *1. We concluded that evidence showing the plaintiffs accessed the online application, agreed to the terms that included the arbitration provision, and completed and submitted the application was "sufficient evidence they agreed to conduct the transaction by electronic means." *Id.* at *5; *see also Wal-Mart Stores v.*

–15–

*Constantine*, No. 05-17-00694-CV, 2018 WL 2001959, at \*6 (Tex. App.—Dallas Apr. 30, 2018, no pet.) (mem. op.) (evidence that decedent accessed module using his "confidential associate identification number and password," clicked through it where required, and acknowledged his completion by clicking an acknowledgement button, was sufficient evidence of surrounding circumstances).

A party's agreement to conduct a particular transaction electronically, however, may not establish its agreement to alter unrelated, material contract terms. *See* UETA § 322.005(b). UETA "applies only to transactions between parties each of which has agreed to conduct transactions by electronic means." *Id.*; *Parks*, 2015 WL 4481768, at \*5. "Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." UETA § 322.005(b). "The right granted by this subsection may not be waived by agreement." *Id.* "Whether an electronic record or electronic signature has legal consequences is determined by this chapter and other applicable law." *Id.* § 322.005(e).

In *Aerotek* and similar cases, prospective employees were "onboarding"— filling out electronic forms to commence their employment relationships and agreeing to resolve future disputes through arbitration—not accepting unilateral, material changes to already-existing agreements. *See, e.g., Aerotek*, 624 S.W.3d at 201 ("To keep hiring efficient, Aerotek worked with a software developer to build an online-only hiring application."); *see also Momentis*, 2014 WL 3700697, at \*1

(describing onboarding process for Momentis's "independent representatives"). The court in *Aerotek* explained that UETA "provides a standard for attributing electronic signatures to" the parties to a transaction, but the court's explanation begins with the requirement, "[o]nce parties to a transaction have 'agreed to conduct [it] by electronic means.'" *Aerotek*, 624 S.W.3d at 205 (quoting UETA § 322.005(b)).

Unlike in *Aerotek*, where the electronic execution of agreements occurred during the onboarding process, TLC and Ambit had a sixteen-year relationship that does not contain a single instance when the parties' rights or obligations were altered through the electronic execution of an agreement. We must give meaning to the UETA's explicit requirement that for a transaction to fall under the Act, there must be a meeting of the minds; here, that the parties intended to use PowerZone not just as a payment portal, but as the means by which the parties would exchange and execute contractual agreements. UETA § 322.005(b).

There is no evidence of such an agreement in this case. LaCore testified that he had never, personally, logged into the PowerZone. While his denial is not a defense to the execution of documents under UETA once an agreement to transact business is established, it is relevant to the first inquiry: whether he, on behalf of TLC, intended to use PowerZone to execute contractual documents. It is not uncommon for administrative functions, such as providing banking information through a payment portal, to be performed by individuals within a company who are not authorized to bind an entity to material contract terms. There is nothing in the

record to show that he, or anyone else with authority to bind TLC, ever intended to use PowerZone for any purpose other than to provide information that Ambit needed to process its payments.

Ambit failed to establish that TLC agreed to use PowerZone as a method of electronically executing agreements that defined the terms under which the parties would do business. Therefore, the use of LaCore's login credentials to select the option for acceptance of Policies and Procedures in order to obtain access to PowerZone did not constitute the execution of an amended agreement between Ambit and TLC that added an arbitration provision to the terms of their well-established business agreement. At most, Ambit established TLC agreed to use PowerZone to provide information required by Ambit to process the commissions to which it was entitled under the terms of their oral agreement. *See* UETA § 322.005(c) ("A party that agrees to conduct a transaction by electronic means may refuse to conduct other transactions by electronic means.").

Because Ambit failed to establish that TLC agreed that PowerZone would be used to amend the material terms of the parties' oral agreement, the Policies and Procedures were not effectively executed by the parties pursuant to the UETA, and Ambit cannot enforce the arbitration provision found therein. For these reasons, we overrule Ambit's second issue.

## 2. Hearing (Issue 1)

In its first issue, Ambit contends the trial court erred by ordering an evidentiary hearing. Ambit argues it "provided prima facie evidence of a valid electronic arbitration agreement using TLC's unique and secure credentials," unrebutted by TLC and LaCore's mere denial. Ambit concludes no evidentiary hearing was warranted because TLC and LaCore "failed to create a genuine issue of material fact" given Ambit's evidence that TLC agreed to conduct transactions electronically.

Evidentiary hearings on motions to compel arbitration are not always required. In *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 269 (Tex. 1992) (orig. proceeding), the supreme court explained that a trial court "may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations." But the court also held that "if the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts." *Id*. In an initial non-evidentiary hearing on Ambit's motion to compel, the trial court identified two possible fact issues "that would push us into a *Tipps* hearing": (1) "there is not enough here on the current testimony to support enforcing the clickwrap," or (2) "the dispute over whether or not [the agreement] was signed by an authorized agent."

–19–

Ambit does not cite authority to support its argument that a trial court reversibly errs by holding a *Tipps* hearing, and we have found none. Instead, the supreme court held in *Tipps* that the trial court "must" conduct an evidentiary hearing to determine disputed material facts. *Tipps*, 842 S.W.2d at 269. Especially given *Aerotek*'s holding that a party's "simple denials" of an electronic signature "are no evidence otherwise," a *Tipps* hearing may be necessary to provide additional evidence of the parties' intent and the circumstances surrounding the signature. *See Aerotek*, 624 S.W.3d at 209; *see also* UETA § 322.005(b) ("Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct."). Concluding that the trial court did not err by holding the *Tipps* hearing, we overrule Ambit's first issue.

### 3. Compelling LaCore, individually, to arbitration (Issue 3)

In its third issue, Ambit argues that the trial court erred by denying Ambit's motion to compel LaCore's claim to arbitration. Ambit does not dispute that LaCore is a nonsignatory to the arbitration agreement, but argues that LaCore should be required to arbitrate because (1) his claims are "factually intertwined with TLC's claims" and (2) he is "bound by direct benefits estoppel." *See, e.g., In re Weekley Homes, L.P.*, 180 S.W.3d 127, 129 (Tex. 2005) ("nonparties may be bound to an arbitration clause when the rules of law or equity would bind them to the contract generally").

"Ordinarily, a non-signatory can be bound by the terms of an arbitration provision only if the non-signatory is asserting claims requiring reliance on the terms of the written agreement containing the arbitration provision." *In re Prudential Secs., Inc.*, 159 S.W.3d 279, 283 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding). "In order to be compelled to arbitrate under an agreement to which it was not a party, the nonsignatory must be seeking the benefits of the contract containing the arbitration provision." *In re Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 195 S.W.3d 807, 816 (Tex. App.—Dallas 2006, orig. proceeding). Here, as we have discussed, Ambit failed to establish that TLC agreed to arbitrate disputes arising out of the 2006 oral agreement. Under these circumstances, LaCore cannot be compelled to arbitrate his claims against Ambit. We overrule Ambit's third issue.

### CONCLUSION

We affirm the trial court's order denying Ambit's motion to compel arbitration.

/Maricela Breedlove/

240009f.p05

MARICELA BREEDLOVE
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

AMBIT MARKETING, LLC,
Appellant

No. 05-24-00009-CV     V.

TLC ENERGY GROUP, LLC AND
TERRY LACORE, Appellees

On Appeal from the 471st Judicial
District Court, Collin County, Texas
Trial Court Cause No. 471-02108-
2023.
Opinion delivered by Justice
Breedlove. Justices Molberg and
Kennedy participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee TLC Energy Group, LLC and Terry Lacore recover their costs of this appeal from appellant Ambit Marketing, LLC.

Judgment entered this 13th day of November, 2024.